**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LYNN HAYES, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **Case Number 21CV05663** |
| WALGREEN CO., an Illinois corporation, and | ) | |
| WALGREENS BOOTS ALLIANCE, INC., | ) | **JURY TRIAL DEMANDED** |
| a foreign corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

NOW COMES the Plaintiff, LYNN HAYES (hereinafter "HAYES"), an Individual, by and through her attorneys, Chitkowski Law Offices, and for her Amended Complaint against the Defendants, WALGREEN CO., and WALGREENS BOOTS ALLIANCE, INC., a Foreign Corporation, states as follows:

### PARTIES

1.      HAYES is a citizen of the State of Illinois and a resident of DuPage County. At all relevant times complained of in this Complaint, HAYES was as employee of WALGREENS.

2.      Defendant, WALGREEN CO. ("WALGREEN") is an Illinois corporation that conducts business in the State of Illinois, with its principal Illinois headquarters in the Village of Deerfield, County of Lake, State of Illinois.

3.      Defendant, WALGREENS BOOTS ALLIANCE, INC. ("WALGREENS BOOTS"), is a foreign corporation that conducts business in the State of Illinois, with its principal Illinois headquarters in the Village of Deerfield, County of Lake, State of Illinois. On information and belief, WALGREENS BOOTS is the parent company to WALGREEN and is a party in interest to the present matter.

**JURISDICTION AND VENUE**

4.      The jurisdiction of this Court is invoked pursuant to the Civil Rights Act, 42 U.S.C.
§ 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. *§* 2000e. et seq. (Title
VII); the judicial code 28 U.S.C. § 1331 and 1343(a); Title I of the Americans with Disabilities Act
of 1990 (ADA), Pub. L. No. 101-336, 104 Stat. 327, and the Constitution of the United States of
America.

5.      Venue in the District Court for the Northern District of Illinois is proper pursuant to
28 U.S.C. § 1391 because a substantial part of the acts of omission on which the claims are asserted
herein occurred within this District and both HAYES and WALGREEN resided in this District at the
time of the events in question.

**ADMINISTRATIVE PREREQUISITES**

6.      HAYES met all of the administrative prerequisites pursuant to Title VII of the Civil
Rights Act, as amended, and the Americans with Disabilities Act.

7.       On June 17, 2019, HAYES filed charges with the Illinois Department of Human
Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC"). IDHR
investigated HAYES' charge and found a lack of substantial evidence that Defendant had
discriminated against her. *See* IDHR Notice of Dismissal for Lack of Substantial Evidence ("IDHR
Notice"), attached as Exhibit 1.

8.      HAYES received a right to sue letter from the EEOC on July 28, 2021. *See* Right to
Sue letter, attached as Exhibit 2.

**NATURE OF THE ACTION**

9.      HAYES had been a hard-working, competent employee in the mailroom for
WALGREEN for approximately (15) years prior to the pattern of discrimination complained of

herein.

10.      At all relevant times complained herein, WALGREEN had implemented a policy of zero tolerance of any actions committed by its employees against each other that could be construed as harassing, discriminatory or retaliatory in any manner. *See* Walgreens Code of Conduct, attached as Exhibit 3.

11.      Starting on or around October 1, 2018, WALGREEN began an unlawful pattern of discrimination, harassment, hostile work environment, and retaliation against her, relating to her disability – deafness, her gender – female, and as retaliation for her reporting improper mailroom practices.

12.      WALGREEN forced HAYES to perform tasks that were not part of her job description, forced HAYES to use equipment that WALGREEN had not provided training for, forced HAYES to perform tasks that other employees were not required to perform, and changed HAYES' work hours in retaliation for reporting previous violations.

13.      WALGREEN'S actions have caused HAYES to suffer public humiliation, and emotional distress, among other injuries. Moreover, WALGREEN engaged in a series of retaliatory actions against HAYES as a result of her ongoing requests for accommodations, assertions of her legal rights, and complaints about being denied the reasonable accommodations to which she was entitled under the law.

## COUNT I - DISCRIMINATION ON THE BASIS OF DISABILITY

1 – 13. HAYES repeats and re-alleges the allegations contained within paragraphs one (1) through thirteen (13) as and for her allegations for paragraphs one (1) through thirteen (13) of Count I.

14.      HAYES is a female with a disability within the meaning of the Americans with

Disabilities Act.

15.     WALGREEN has been aware of HAYES' disability since she began her employment.

16.     HAYES began working under the supervision of Stephanie Bristow on or around October 1, 2018.

17.     At all relevant times herein, HAYES has been a hard-working, competent employee who met or exceeded WALGREEN'S legitimate business expectations.

18.     Beginning on or about October 2018, HAYES was subjected to severe or pervasive discrimination, harassment, and a hostile work environment on the basis of her disability, deafness.

19.     From October 2018 – March 2019, Stephanie Bristow, HAYES' direct supervisor displayed harassing and hostile conduct towards HAYES on numerous occasions in an attempt to blame HAYES for certain mailroom tracking issues that Ms. Bristow knew or would have known upon reasonable investigation, were not the result of HAYES' actions. HAYES reported this harassing and hostile conduct to Stephanie Peters, the direct supervisor of Ms. Bristow. WALGREEN did not apply the same policy towards other employees.

20.     In November of 2018, Ms. Bristow, for no apparent reason, took a mail cart that HAYES had been using. When HAYES asked for the cart to be returned, Ms. Bristow mocked HAYES and made verbal comments that HAYES would not be able to hear because of HAYES' disability.

21.     On November 15, 2018, HAYES was forced to use a power lift to transport a pallet order of (84) water cases into a van and deliver it to Walgreens University; which on average, required 2-3 men to complete in the same amount allocated for HAYES to complete. HAYES was not trained or certified to use a power lift, yet WALGREEN, by and through the actions of Ms. Bristow, harassed and forced HAYES to use the power lift. HAYES reported this harassing and

hostile conduct to Stephanie Peters, the direct supervisor of Ms. Bristow. WALGREEN did not apply the same policy towards other employees.

22.     On November 26, 2018, Ms. Bristow angrily directed HAYES to complete a tub of "look-ups" over and above HAYES' job description.

23.     On multiple occasions, from October 2018 to March of 2019, HAYES was forced to process more mail and more "look-ups" than other employees. HAYES was forced to miss scheduled break times and was harassed by WALGREEN when she had to use the bathroom. HAYES reported this harassing and hostile conduct to Stephanie Peters, the direct supervisor of Ms. Bristow. WALGREEN did not apply the same policy towards other employees.

24.     In January 2019, WALGREEN forced HAYES to work changed hours even though her hours had not changed for 10 of her 15 years of employment. HAYES reported this harassing and hostile conduct to Stephanie Peters, the direct supervisor of Ms. Bristow. WALGREEN did not apply the same policy towards other employees.

25.     On February 11, 2019, after being reported for violations of mailroom procedures, Ms. Bristow retaliated against HAYES by acting like a deaf person, mimicking HAYES, and pretending to be deaf. When HAYES attempted to request that Ms. Bristow stop her actions, Ms. Bristow rolled her eyes at HAYES.

26.     On February 13, 2019 Ms. Bristow wrote-up HAYES for an alleged disruptive behavior related to an email to an Employee, Colin Kapinos. This write-up was meant to harass and intimidate HAYES. When HAYES attempted to discuss this situation with Ms. Bristow, Ms. Bristow instead mocked and harassed HAYES' disability by again pretending to be deaf.

27.     Additional examples of the discriminatory and harassing conduct of WALGREEN against HAYES are as follows:

    a.    HAYES was given the sole duty of Mail Services Emails. When HAYES could not respond, Ms. Bristow would get mad. She would use her hand "Check the Mail Services" "Check the Mail Services" in a repetitive and angry tone with her hands towards HAYES.

    b.    Ms. Bristow would purposely set up one on one meetings with HAYES, at the busiest time of the day, so that HAYES would fall behind on her workload. Then HAYES would be reprimanded for falling behind.

    c.    For supply orders, HAYES was given one extra building to deliver supplies to. No other employee was given an extra building to deliver.

28.    On February 28, 2019, HAYES was again directed to move and deliver cases of water. When she asked for assistance to perform this task, she was denied. When HAYES returned to the mailroom, Ms. Bristow smirked and refused to explain why HAYES was directed to perform the task.

29.    HAYES reported the discriminatory application of the employment policies to Stephanie Peters, the direct supervisor of Ms. Bristow.

30.    In addition, HAYES reported the harassing and discriminatory conduct to Employee Relations, Henderson Banks. No further action was taken by WALGREEN.

31.    There is no legitimate, non-discriminatory basis for harassing, and/or discriminating acts committed by Ms. Bristow against HAYES.

32.    HAYES was discharged by WALGREEN, due to an alleged disruptive performance, which was caused by the harassing and discriminatory conduct of Ms. Bristow toward HAYES.

33.    As described above, WALGREEN discriminated against HAYES based on her disability, deafness, in violation of the Act.

34.    HAYES has suffered and continues to suffer severe injury and damages as a direct and proximate result of WALGREEN'S discrimination, harassment, hostile work environment, and retaliatory discharge on the basis of HAYES' disability.

WHEREFORE, HAYES respectfully requests that this Court award her:

a.    Compensatory damages;

b.    Pre-judgment and post-judgment interest on the above damages;

c.    Attorney's fees, costs and litigation expenses; and

d.    Such other and further relief as the Court deems just and proper.

## COUNT II - DISCRIMINATION ON THE BASIS OF GENDER

1 – 32. HAYES repeats and re-alleges the allegations contained within paragraphs one (1) through thirty-two (32) of Count I as and for her allegations for paragraphs one (1) through thirty-two (32) of Count II.

33.    Ms. Hayes was subjected to severe or pervasive discrimination, harassment, and a hostile work environment on the basis of her gender, female.

34.    As previously alleged herein, HAYES was directed to perform tasks, such as the loading and delivery of water bottle pallets, that were outside of her job description and was in fact a task suited for 2 – 3 able bodied men.

35.    As previously alleged herein, HAYES was denied access or use of the bathroom facilities and instead forced to process more mail and more "look-ups."

36.    As described above, WALGREEN discriminated against Ms. Hayes based of her gender, female, in violation of the Act.

37.    Ms. Hayes has suffered and continues to suffer severe injury and damages as a direct and proximate result of WALGREEN'S discrimination, harassment, hostile work environment, and

retaliatory discharge on the basis of Ms. Hayes' gender.

WHEREFORE, Ms. Hayes respectfully requests that this Court award her:

a.     Compensatory damages;

b.     Pre-judgment and post-judgment interest on the above damages;

c.     Attorney's fees, costs and litigation expenses; and

d.     Such other and further relief as the Court deems just and proper.

## COUNT III – RETALIATORY DISCHARGE

1 – 32. HAYES repeats and re-alleges the allegations contained within paragraphs one (1) through thirty-two (32) of Count I as and for her allegations for paragraphs one (1) through thirty-two (32) of Count III.

33.     In December 2018, HAYES reported a violation of mail room practices, specifically that Stephanie Bristow took WALGREEN mail home, to Stephanie Peters.

34.     This violation was also reported to the Privacy Department, Doris Pigott and subsequently to the Compliance Officer, Anne Kirwan.

35.     Despite the report submitted by HAYES, Ms. Kirwan failed to address the violation.

36.     HAYES was a hard-working, competent employee who, at all relevant times herein, met or exceeded Respondent's legitimate business expectations.

37.     On March 4, 2019, HAYES was discharged by WALGREEN without just cause or legal basis. The reason given was disruptive performance. HAYES has never been disruptive.

38.     The discharge followed Ms. Hayes' last complaint of a violation of mail room practices within a short period of time, thereby raising an inference of retaliatory motivation.

39.     The harassing and discriminatory acts committed by Ms. Bristow giving rise to the incident occurring on February 13, 2019, allegedly serving as the basis for HAYES' termination were omitted from reference by WALGREEN.

WHEREFORE, Ms. Hayes respectfully requests that this Court award her:

a.      Compensatory damages;

b.      Pre-judgment and post-judgment interest on the above damages;

c.      Attorney's fees, costs and litigation expenses; and

d.      Such other and further relief as the Court deems just and proper.

**COUNT IV**
**DISCRIMINATION ON THE BASIS OF DISABILITY (STATE LAW CLAIM)**

1 – 15. HAYES repeats and re-alleges the allegations contained within paragraphs one (1) through fifteen (15) as and for her allegations for paragraphs one (1) through fifteen (15) of Count IV.

16.     HAYES is a female with a disability within the meaning of Section 1-103(I) of the Illinois Human Rights Act.

17.     WALGREEN has been aware of HAYES' disability since she began her employment.

18.     HAYES began working under the supervision of Stephanie Bristow on or around October 1, 2018.

19.     At all relevant times herein, HAYES has been a hard-working, competent employee who met or exceeded WALGREEN'S legitimate business expectations.

20.     Beginning on or about October 2018, HAYES was subjected to severe or pervasive discrimination, harassment, and a hostile work environment on the basis of her disability, deafness.

21.     From October 2018 – March 2019, Stephanie Bristow, HAYES' direct supervisor

displayed harassing and hostile conduct towards HAYES on numerous occasions in an attempt to blame HAYES for certain mailroom tracking issues that Ms. Bristow knew or would have known upon reasonable investigation, were not the result of HAYES' actions. HAYES reported this harassing and hostile conduct to Stephanie Peters, the direct supervisor of Ms. Bristow. WALGREEN did not apply the same policy towards other employees.

22. In November of 2018, Ms. Bristow, for no apparent reason, took a mail cart that HAYES had been using. When HAYES asked for the cart to be returned, Ms. Bristow mocked HAYES and made verbal comments that HAYES would not be able to hear because of HAYES' disability.

23. On November 15, 2018, HAYES was forced to use a power lift to transport a pallet order of (84) water cases into a van and deliver it to Walgreens University; which on average, required 2-3 men to complete in the same amount allocated for HAYES to complete. HAYES was not trained or certified to use a power lift, yet WALGREEN, by and through the actions of Ms. Bristow, harassed and forced HAYES to use the power lift. HAYES reported this harassing and hostile conduct to Stephanie Peters, the direct supervisor of Ms. Bristow. WALGREEN did not apply the same policy towards other employees.

24. On November 26, 2018, Ms. Bristow angrily directed HAYES to complete a tub of "look-ups" over and above HAYES' job description.

25. On multiple occasions, from October 2018 to March of 2019, HAYES was forced to process more mail and more "look-ups" than other employees. HAYES was forced to miss scheduled break times and was harassed by WALGREEN when she had to use the bathroom. HAYES reported this harassing and hostile conduct to Stephanie Peters, the direct supervisor of Ms. Bristow. WALGREEN did not apply the same policy towards other employees.

26.     In January 2019, WALGREEN forced HAYES to work changed hours even though her hours had not changed for 10 of her 15 years of employment. HAYES reported this harassing and hostile conduct to Stephanie Peters, the direct supervisor of Ms. Bristow. WALGREEN did not apply the same policy towards other employees.

27.     On February 11, 2019, after being reported for violations of mailroom procedures, Ms. Bristow retaliated against HAYES by acting like a deaf person, mimicking HAYES, and pretending to be deaf. When HAYES attempted to request that Ms. Bristow stop her actions, Ms. Bristow rolled her eyes at HAYES.

28.     On February 13, 2019 Ms. Bristow wrote-up HAYES for an alleged disruptive behavior related to an email to an Employee, Colin Kapinos. This write-up was meant to harass and intimidate HAYES. When HAYES attempted to discuss this situation with Ms. Bristow, Ms. Bristow instead mocked and harassed HAYES' disability by again pretending to be deaf.

29.     Additional examples of the discriminatory and harassing conduct of WALGREEN against HAYES are as follows:

    a.     HAYES was given the sole duty of Mail Services Emails. When HAYES could not respond, Ms. Bristow would get mad. She would use her hand "Check the Mail Services" "Check the Mail Services" in a repetitive and angry tone with her hands towards HAYES.

    b.     Ms. Bristow would purposely set up one on one meetings with HAYES, at the busiest time of the day, so that HAYES would fall behind on her workload. Then HAYES would be reprimanded for falling behind.

    c.     For supply orders, HAYES was given one extra building to deliver supplies to. No other employee was given an extra building to deliver.

30.     On February 28, 2019, HAYES was again directed to move and deliver cases of water. When she asked for assistance to perform this task, she was denied. When HAYES returned to the mailroom, Ms. Bristow smirked and refused to explain why HAYES was directed to perform the task.

31.     HAYES reported the discriminatory application of the employment policies to Stephanie Peters, the direct supervisor of Ms. Bristow.

32.     In addition, HAYES reported the harassing and discriminatory conduct to Employee Relations, Henderson Banks. No further action was taken by WALGREEN.

33.     There is no legitimate, non-discriminatory basis for harassing, and/or discriminating acts committed by Ms. Bristow against HAYES.

34.     HAYES was discharged by WALGREEN, due to an alleged disruptive performance, which was caused by the harassing and discriminatory conduct of Ms. Bristow toward HAYES.

35.     As described above, WALGREEN discriminated against HAYES based on her disability, deafness, in violation of the IHRA, 775 ILCS 5/1-103(I).

36.     HAYES has suffered and continues to suffer severe injury and damages as a direct and proximate result of WALGREEN'S discrimination, harassment, hostile work environment, and retaliatory discharge on the basis of HAYES' disability.

WHEREFORE, HAYES respectfully requests that this Court award her:

e.     Compensatory damages;

f.     Pre-judgment and post-judgment interest on the above damages;

g.     Attorney's fees, costs and litigation expenses; and

h.     Such other and further relief as the Court deems just and proper.

## COUNT V

**DISCRIMINATION ON THE BASIS OF GENDER (STATE LAW CLAIM)**

1 – 34. HAYES repeats and re-alleges the allegations contained within paragraphs one (1) through thirty-four (34) of Count IV as and for her allegations for paragraphs one (1) through thirty-four (34) of Count V.

35. Ms. Hayes was subjected to severe or pervasive discrimination, harassment, and a hostile work environment on the basis of her gender, female.

36. As previously alleged herein, HAYES was directed to perform tasks, such as the loading and delivery of water bottle pallets, that were outside of her job description and was in fact a task suited for 2 – 3 able bodied men.

37. As previously alleged herein, HAYES was denied access or use of the bathroom facilities and instead forced to process more mail and more "look-ups."

38. As described above, WALGREEN discriminated against Ms. Hayes based of her gender, female, in violation of the IHRA, 775 ILCS 5/1-103(O).

39. Ms. Hayes has suffered and continues to suffer severe injury and damages as a direct and proximate result of WALGREEN'S discrimination, harassment, hostile work environment, and retaliatory discharge on the basis of Ms. Hayes' gender.

WHEREFORE, Ms. Hayes respectfully requests that this Court award her:

e. Compensatory damages;

f. Pre-judgment and post-judgment interest on the above damages;

g. Attorney's fees, costs and litigation expenses; and

h. Such other and further relief as the Court deems just and proper.

**COUNT VI – RETALIATORY DISCHARGE (STATE LAW CLAIM)**

1 – 34. HAYES repeats and re-alleges the allegations contained within paragraphs one (1)

through thirty-four (34) of Count IV as and for its allegations for paragraphs one (1) through thirty-four (34) of Count VI.

35.     In December 2018, HAYES reported a violation of mail room practices, specifically that Stephanie Bristow took WALGREEN mail home, to Stephanie Peters.

36.     This violation was also reported to the Privacy Department, Doris Pigott and subsequently to the Compliance Officer, Anne Kirwan.

37.     Despite the report submitted by HAYES, Ms. Kirwan failed to address the violation.

38.     HAYES was a hard-working, competent employee who, at all relevant times herein, met or exceeded Respondent's legitimate business expectations.

39.     On March 4, 2019, HAYES was discharged by WALGREEN without just cause or legal basis. The reason given was disruptive performance. HAYES has never been disruptive.

40.     The discharge followed Ms. Hayes' last complaint of a violation of mail room practices within a short period of time, thereby raising an inference of retaliatory motivation.

41.     The harassing and discriminatory acts committed by Ms. Bristow giving rise to the incident occurring on February 13, 2019 allegedly serving as the basis for HAYES' termination were omitted from reference by WALGREEN.

WHEREFORE, Ms. Hayes respectfully requests that this Court award her:

e.     Compensatory damages;

f.     Pre-judgment and post-judgment interest on the above damages;

g.     Attorney's fees, costs and litigation expenses; and

h.     Such other and further relief as the Court deems just and proper.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (STATE LAW CLAIM)

1 – 34. HAYES repeats and re-alleges the allegations contained within paragraphs one (1) through thirty-four (34) of Count IV as and for its allegations for paragraphs one (1) through thirty-four (34) of Count VII.

35.     At the time and place aforesaid, WALGREEN as HAYES' employer, had actual authority over Ms. Hayes.

36.     On or about October 2018 through the date of HAYES' termination, Ms. Bristow was HAYES' direct supervisor assigned by WALGREEN.

37.     On or about October 2018 through the date of HAYES' termination, had actual knowledge of HAYES' disability as well the reasonable accommodations made to HAYES over her past fifteen (15) years of service working for WALGREEN.

38.     On or about October 2018 through the date of HAYES' termination, WALGREEN knew or should have known that the harassing and discriminatory acts committed by its employee and HAYES supervisor, Ms. Bristow, would cause emotional distress to HAYES.

39.     Despite multiple reports by HAYES of Ms. Bristow's harassing and discriminatory acts against HAYES, WALGREEN failed to remove and/or discipline Ms. Bristow to prevent her from continuing her misconduct toward HAYES.

40.     The repeated acts of harassment and discriminatory conduct by Ms. Bristow against HAYES, without any action taken by WALGREEN, proximately caused HAYES to sustain severe and extreme emotional distress.

41.     WALGREEN unjust termination of HAYES on March 4, 2019 further served to proximately cause HAYES to sustain further severe and extreme emotional distress.

42.    As a result of the severe and extreme emotional distress suffered by HAYES as a proximate result of the intentional acts committed by WALGREEN, HAYES has had to seek and continues to seek medical treatment.

WHEREFORE, HAYES demands judgment against WALGREEN for a sum in excess of the jurisdictional limit of this court.

Respectfully Submitted,
CHITKOWSKI LAW OFFICES

By:    */s/ Bryan R. Kelsey* _____
One of its Attorneys

CHITKOWSKI LAW OFFICES
John J. Chitkowski – 6273102
Bryan R. Kelsey – 6317918
901 Warrenville Rd., Suite 103
Lisle, Illinois 60532
Tel: 630/824-4808; Fax: 630/824-4809
jjc@chitkowskilaw.com
brk@chitkowskilaw.com

**EXHIBIT**

**1**

**STATE OF ILLINOIS** )
                ) **ss**
**COUNTY OF COOK** )                       **CHARGE NO. 2019CF2842**

### AFFIDAVIT OF SERVICE

Monica Vandeven , deposes and states that s/he served a copy of the attached

**NOTICE OF DISMISSAL FOR LACK OF SUBSTANTIAL EVIDENCE** on each person

named below by depositing the same on November 19, 2020 , in the U.S. Mail Box  at

100 West Randolph Street, Chicago, Illinois, properly posted for FIRST

CLASS MAIL, addresses as follows:

For Complainant

John Chitkowski
Chitkowski Law Offices
901 Warrenville Road
Suite 103
Lisle, IL 60532

For Respondent

Frank Bear
Walgreen Company
104 Wilmot Road
4th Floor, MS 144W
Deerfield, IL 60015

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

_____
Monica Vandeven

**PLEASE NOTE:**

The above-signed person is responsible only for _mailing_ these documents.  If you wish a review of the findings in this case, you must complete the Request for Review form attached. Department of Human Rights' staff are not permitted to discuss the investigation findings once a Notice of Dismissal has been issued.

**STATE OF ILLINOIS**
**DEPARTMENT OF HUMAN RIGHTS**

IN THE MATTER OF:

LYNN HAYES,

|  |  |  |  |
|---|---|---|---|
| | ) | | |
| | ) | | |
| | ) | | |
| COMPLAINANT, | ) | CHARGE NO. | 2019CF2842 |
| AND | ) | EEOC NO. | 21BA91821 |
| | ) | | |
| WALGREENS BOOTS ALLIANCE, INC., | ) | | |
| | ) | | |
| | ) | | |
| | ) | | |
| | ) | | |
| RESPONDENT. | ) | | |

**NOTICE OF DISMISSAL**
**FOR LACK OF SUBSTANTIAL EVIDENCE**

For Complainant

John Chitkowski
Chitkowski Law Offices
901 Warrenville Road
Suite 103
Lisle, IL 60532

For Respondent

Frank Bear
Walgreen Company
104 Wilmot Road
4th Floor, MS 144W
Deerfield, IL 60015

DATE OF DISMISSAL: November 19, 2020

1.    YOU ARE HEREBY NOTIFIED that based upon the enclosed investigation report, the Department has determined that there is NOT substantial evidence to support the allegation(s) of the charge. Accordingly, pursuant to Section 7A-102(D) of the Act (775 ILCS 5/1-101 et seq.) and the Department's Rules and Regulations (56 Ill. Adm. Code. Chapter II, §2520.560) the charge is HEREBY DISMISSED.

2.    If Complainant disagrees with this action, Complainant may:

a) Seek review of this dismissal before the Illinois Human Rights Commission (Commission), 100 West Randolph Street, Suite 5-100, Chicago, Illinois, 60601, by filing a "Request for Review" with the Commission by the request for review filing date below. Respondent will be notified by the Commission if a Request for Review is filed.

**REQUEST FOR REVIEW FILING DEADLINE DATE:** February 22, 2021

Or, Complainant may:

b) Commence a civil action in the appropriate state circuit court within ninety (90) days after receipt of this Notice. A complaint should be filed in the Circuit court in the county where the civil rights violation was allegedly committed.

**Page 2**
**Notice of Dismissal for Lack of Substantial Evidence**
**Charge No. 2019CF2842**

> **If you intend to exhaust your State remedies, please notify the Equal Employment Opportunity Commission (EEOC) immediately. The EEOC generally adopts the Department's findings.** The Appellate Courts in <u>Watkins v. Office of the State Public Defender</u>, ___ Ill.App.3d ___, 976 N.E.2d 387 (1st Dist. 2012) and <u>Lynch v. Department of Transportation,</u> ___ Ill.App.3d ___, 979 N.E.2d 113 (4th Dist. 2012), have held that discrimination complaints brought under the Illinois Human Rights Act ("IHRA") against the State of Illinois **in the Illinois Circuit Court** are barred by the State Lawsuit Immunity Act. (745 ILCS 5/1 et seq.). Complainants are encouraged to consult with an attorney prior to commencing a civil action in the Circuit Court against the State of Illinois.

**PLEASE NOTE: The Department cannot provide any legal advice or assistance. Please contact legal counsel, your city clerk, or your county clerk with any questions.**

3.    Complainant is hereby notified that the charge(s) will be dismissed with prejudice and with no right to further proceed if a timely request for review is not filed with the Commission, or a timely written complaint is not filed with the appropriate circuit court.

4.    If an EEOC charge number is cited above, this charge was also filed with the Equal Employment Opportunity Commission (EEOC). If this charge alleges a violation under Title VII of the Civil Rights Act of 1964, as amended, or the Age Discrimination in Employment Act of 1967, Complainant has the right to request EEOC to perform a Substantial Weight Review of this dismissal. Please note that in order to receive such a review by the EEOC, it must be requested in writing to EEOC within fifteen (15) days of the receipt of this notice. However, if Complainant chooses to file a timely "Request for Review" of this dismissal with the Illinois Human Rights Commission, then Complainant must wait until receipt of a **final** notice/order by the Commission before requesting a Substantial Weight Review by the EEOC. Complainant must make a written request for Substantial Weight Review by the EEOC within fifteen (15) days of the receipt of the Human Rights Commission's **final** notice/order. Any request filed prior to your receipt of a final notice/order WILL NOT BE HONORED. Send your request for a Substantial Weight Review to **EEOC, John C. Kluczynski Federal Building, 230 South Dearborn Street, Suite 1866, Chicago, Illinois  60604.** Otherwise, EEOC will generally adopt the Department of Human Rights' action in this case.

DEPARTMENT OF HUMAN RIGHTS
James L. Bennett
Director

HB1509/HB59 NOD/LSE 03/6/2020

**STATE OF ILLINOIS**
**DEPARTMENT OF HUMAN RIGHTS**

**IN THE MATTER OF:**

LYNN HAYES,

                COMPLAINANT,     CHARGE NO.     2019CF2842

AND                                     EEOC NO.       21BA91821

WALGREENS BOOTS ALLIANCE, INC.,

                RESPONDENT.

## REQUEST FOR REVIEW

John Chitkowski
Chitkowski Law Offices
901 Warrenville Road
Suite 103
Lisle, IL 60532

Frank Bear
Walgreen Company
104 Wilmot Road
4th Floor, MS 144W
Deerfield, IL 60015

**TO:** LYNN HAYES,

**DATE:** November 19, 2020

**REQUEST FOR REVIEW FILING DEADLINE DATE:** February 22, 2021

I hereby request that the dismissal of the charge by the Illinois Department of Human Rights (Department) be reviewed by the Illinois Human Rights Commission (Commission).

Complainant's Current Address (please print clearly):

_____Apt/Unit #_____

City_____ State_____ Zip_____ Phone (____)_____

**Page 2**
**Request for Review**
**Charge No. 2019CF2842**

IN THE SPACE PROVIDED BELOW, YOU <u>MUST</u> LIST AND DESCRIBE THE SPECIFIC REASONS THAT THE CHARGE SHOULD NOT HAVE BEEN DISMISSED. If applicable, you may write on the back of this form or attach additional information or documents, which support your Request for Review. You may review your investigation file to help you prepare your request by calling (312) 814-6262 or (217) 785-5100. The Department's investigation file may be reviewed or copied upon request once the Department's investigation has been completed. The Department is not responsible for copy service fees. A minimum of three (3) business days' notice is required. Call (312) 814-6262 to make arrangements.

_____

|                                   |                         |
|-----------------------------------|-------------------------|
| SIGNATURE                         | DATE                    |

<u>**YOU MUST ENCLOSE THE ORIGINAL AND THREE COPIES, INCLUDING SUPPORTING DOCUMENTS, OF YOUR ENTIRE REQUEST AND YOU MUST SIGN, DATE AND HAVE THIS FORM POSTMARKED OR HAND DELIVERED BY THE FILING DEADLINE DATE ABOVE, TO:**</u>

**Illinois Human Rights Commission, 100 West Randolph Street, Suite 5-100, Chicago, IL 60601; Telephone: (312) 814-6269; TDD: (312) 814-4760.**

Please note that pursuant to Section 5300.410 of the Commission's Procedural Rules (56 Ill. Admin. Code §5300.410), except by permission of the Commission, the request, argument and supporting materials shall not exceed 30 pages.

Further, note that pursuant to 56 Ill. Admin. Code § 5300.40(b) of the Commission's Procedural Rules, all arguments in support of the Request for Review must be written on 8 ½" x 11" paper. Any argument submitted on non-conforming paper, such as a "post-it" note, will not be considered part of the Request for Review and will be disregarded by the Commission.

**THIS FORM MAY NOT BE SENT VIA TELEFAX.**
HB1509/HB59 HRC R/R 1/17

**STATE OF ILLINOIS**
**DEPARTMENT OF HUMAN RIGHTS**
**INVESTIGATION REPORT**

| | | | |
|---|---|---|---|
| **Complainant:** | Ms. Lynn Hayes | **IDHR No.:** | 2019CF2842 |
| **Respondent:** | Walgreens Boots Alliance, Inc. | **EEOC No.:** | 21BA91821 |

| | | | | | |
|---|---|---|---|---|---|
| **Investigator:** | JWW | **Supervisor:** | ABT | **Date:** | 11/5/2020 |

**Issue/Basis:**

A. Harassment/Disability, Deafness
B. Harassment/Sex, female
C. Harassment/Retaliation
D. Failure to provide a reasonable accommodation/Disability, Deafness
E. Written warning/Disability, Deafness
F. Written warning/Sex, female
G. Written warning/Disability, Retaliation
H. Change in work hours/Retaliation
I. Change in work hours/Disability, Deafness
J. Change in work hours/Sex, female
K. Discharge/Disability, Deafness
L. Discharge/Sex, female
M. Discharge/Retaliation

**Finding:**

A. Lack of Substantial Evidence
B. Lack of Substantial Evidence
C. Lack of Substantial Evidence
D. Lack of Substantial Evidence

E. Lack of Substantial Evidence
F. Lack of Substantial Evidence
G. Lack of Substantial Evidence
H. Lack of Substantial Evidence
I. Lack of Substantial Evidence

J. Lack of Substantial Evidence
K. Lack of Substantial Evidence
L. Lack of Substantial Evidence
M. Lack of Substantial Evidence

**Jurisdiction:**

| | |
|---|---|
| Alleged violation: | A & B: October 2018-March 2019; C: November 26, 2018[1]; D: December 2018-February 2019; E-G: February 13, 2019; H-J: January 2019; K-M: March 3, 2019 |
| Charge filed: | June 14, 2019 |
| Charge perfected: | June 17, 2019 |
| Amendments: | None |
| Number of employees: | 2,964 |

---

[1] Complainant's instant charge indicates that she was subjected to harassment from October 2018 to March 2019. During the course of the investigation, Complainant identified one date for when she was allegedly subjected to harassment in retaliation for engaging in a protected activity, and the date was November 26, 2018.

Charge No.: 2019CF2842
Page 2 of 41

**Verified Response:**

Note: Pursuant to Public Act 100-0492, a verified response is not required for a charge filed on or after September 8, 2017.

**Employment Data**:

Respondent's 2018 Employer Information Report **(Exhibit A)** indicates that Respondent employed 2,964 individuals in various positions and 1,632 (55%) are female. Respondent reported that it does not track the disability status or protected activity status of its employees.

**Uncontested Facts**:

1.      Complainant began working for Respondent on December 15, 2003.

**Complainant's Allegations-Counts A & B:**

Complainant alleges that she was subjected to harassment from October 2018 to March 2019, due to her disability, deafness (Count A) and her sex, female (Count B). Complainant alleges that she began working for Respondent on December 15, 2003. Complainant alleges that her work performance as Mail/Shipping Clerk met Respondent's expectations. Complainant alleges that from October 2018 to March 2019, she was subjected to harassment by Stephanie Bristow (no known disability, female) in that Bristow blamed her for errors that were not her fault; forced her to use a power lift; forced her to process more mail and more "look-ups" than other employees; forced her to miss scheduled break times; and mocked her. Complainant alleges that the harassment created a hostile and egregious work environment which interfered with her ability to perform her job duties. Complainant alleges that similarly situated, non-disabled employees or male employees were not treated in a similar manner.

**Respondent's Defense-Counts A & B:**

Respondent's articulated, non-discriminatory defense is that Complainant was not subjected to harassment during her employment, and that she did not file any internal complaints of harassment during her employment with Respondent.

**Investigation Summary-Counts A & B:**

A.      **Complainant's Evidence:**

1.      Complainant stated that she was hired on December 15, 2003, for the position of Mailroom Clerk.[2]   Complainant stated that she was hired by Linda Balsamo, Supervisor. Complainant stated that Balsamo has no known disability.   Complainant stated that on September 27, 2018, Stephanie Peters (no known disability, female) became her immediate supervisor.

---

[2] The official title for the position is Specialist, Office Support, Print & Mailroom (SOSPM).

Charge No.: 2019CF2842
Page 3 of 41

2.    Complainant stated that Respondent has a large campus. Complainant stated that she held several positions within the campus and some off campus during her 15-year employment with Respondent. Complainant stated that on October 1, 2018, she moved back to Respondent's 200 Building Dock to work on the dock/incoming/distribution of packages and she also worked at the 300 Building, doing mails, metering, driving routes, scanned incoming/distributing packages and shipping Information Technology (IT) materials/merchandising materials to vendors/international. Complainant stated that every day, from 9:00 a.m. to 12:00 p.m. she worked at the 200 Building Dock, scanning all the incoming packages and distributing them. Complainant stated that for the rest of the day she was at the 300 Building completing several mail services duties.

3.    Complainant stated that her disability is deafness. Complainant stated that Respondent has been aware of her disability since she began her employment with Respondent. **Group Exhibit B** is the Department's Verification of Disability Form and a note Candice Robb-Rarey. The Verification of Disability Form indicates that Complainant's condition is not minor and is permanent. A note attached to the form is dated March 14, 2019, and it indicates that Robb-Rarey indicates that Complainant is her patient and has a physical impairment being complete deafness.

4.    Complainant stated that Stephanie Bristow (no known disability, female) became her supervisor on or around October 1, 2018. Complainant stated that Stephanie Peters (no known disability, female) was the direct supervisor for Bristow.

5.    Complainant stated that Stephanie Bristow's title/position was Manager, Campus Building Operations Manager. Complainant stated that Bristow oversaw the whole campus' needs like parking passes, shuttle bus schedules, outsourcing services and the mailroom department. Complainant stated that Bristow began working with her team on October 1, 2018. Complainant stated that Bristow wanted to learn what they all did in the mailroom. Complainant stated that Bristow became the Manager of the mailroom on November 13, 2018.

6.    Complainant stated that Kieran Martin (Kerry) (no known disability, male); Melissa Thomas (no known disability, female); and, Juanita Barrera (no known disability, female) also worked under the supervision of Stephanie Bristow. Complainant stated that Martin worked for Respondent for 29 years; Thomas worked for Respondent for 19 years; and, Barrera worked for Respondent for 23 years. Complainant stated that there used to be 14 employees in the mailroom but Respondent got rid of ten and she, Martin, Thomas and Barrera remained.

7.    Complainant stated that she, Kieran Martin, Melissa Thomas and Juanita Barrera worked in the Mail Service Department. Complainant stated that she, Martin, Thomas and Barrera had the same job duties. **Group Exhibit D** is the job description for Specialist, Office Support, Print & Mailroom (SOSPM). The summary of the position indicates that the SOSPM is responsible for mail preparation, mail pickup, delivery to various Walgreens company locations and United States Post Offices along with day-to-day lettershop job

Charge No.: 2019CF2842
Page 4 of 41

tasks. The job description provides 13 job responsibilities, including substituting for other Mail Services employees, including Drivers, as needed.

8. Complainant stated that she was not provided with an employee handbook. Complainant stated that her attorney eventually obtained a copy of Respondent's Code of Conduct and Business Ethics after she was discharged. **Group Exhibit C** is Respondent's Code of Conduct & Business Ethics. On page 17 of the Code of Conduct & Business Ethics is Respondent's policy regarding harassment. The policy provides the definition of illegal harassment. The policy indicates that Respondent does not tolerate harassment of any kind. On page eight it provides the various resources available to raise any issues or concerns and the resources include the manager, another member of management, the Global Chief Compliance and Ethics Officer, the Executive Vice-President, Global Chief Administrative Officer and General Counsel, the Vice-President, Global Internal Audit, or one of the confidential reporting telephone lines/website addresses in Appendix A.

9. Complainant stated that the first date she felt subjected to harassment was October 1, 2018. Complainant stated that Stephanie Bristow assigned her to work the 200 Building by herself. Complainant stated that this was a two-man job, eight hours per person. Complainant stated that Bristow squeezed it for one person from 9:00 a.m. to 12:00 p.m. Complainant stated that Bristow harassed her for that whole first month stating that nothing was done. Complainant stated that if she had packages aside, Bristow yelled at her to look it up and find out who the packages belonged to. Complainant stated that Bristow's anger was out of control. Complainant stated that she had never worked at 200 Building in her 15 years of employment with Respondent. Complainant stated that before Bristow came, she worked at 1425/1435 Buildings which houses the Information Technology (IT) Department and the Loss Prevention Department.

10. Complainant stated that during the whole month of October 2018, Stephanie Bristow harassed her on a daily basis and harassed her aggressively about packages. Complainant stated that Bristow would text her to hurry her up to get back to the 300 Building to do more work. Complainant stated that she had no breaks or bathroom breaks between buildings.

11. Complainant stated that Stephanie Bristow harassed her every day. Complainant stated that Bristow micromanaged her, rushing her and pushing for jobs to be done. Complainant stated that she worked at the 200 building dock from 9:00 a.m. to 12:00 p.m. Complainant stated that Bristow would tell her, "I want you back here after you are done at 200 Building to start working here. Start the look ups and sort mail." Complainant stated that then, Bristow would text her and state, "Please make sure you're back in 300 at 12. I need you sorting the remaining mail." Complainant stated that she told Bristow that she would after she went to the bathroom and washed her hands. Complainant stated that when she got to 300, Bristow told her that she needed her there by 12:00 p.m. Complainant stated that she told Bristow that she wanted her to work on the 200 building dock from 9:00 a.m. to 12:00 p.m. and then come to 300 by noon but she had to go to the bathroom and she had to have lunch. Complainant stated that she did not get any breaks for four months. Complainant

Charge No.: 2019CF2842
Page 5 of 41

stated that this incident occurred on December 18, 2018, but she did this on several other days, especially on the days that Bristow wanted her to help Kerry Martin in the print room.

12. Complainant stated that when Stephanie Bristow was alone with her, she did not want to communicate. Complainant stated that when the team was around, she asked the team to tell me what she was saying. Complainant stated that she would tell the team, "Tell Lynn I said this…" "Tell Lynn about the new changes…" "Tell Lynn the new mail stop numbers for…." Complainant stated that the team had to communicate with her. Complainant stated that if the team was wrong with any information, then she was wrong for doing her job wrong and Bristow would get angry with her. Complainant stated that it was Bristow's job to communicate with her, not her team members.

13. Complainant stated that her team members received performance evaluations on February 27, 2019 but she never received her performance evaluation. **Group Exhibit E** is a Performance Improvement Plan (PIP) that Complainant submitted. The PIP is for employee, Melissa Thomas. The PIP indicates a start date of February 28, 2019. The last page indicates the PIP was signed by Stephanie Bristow on February 27, 2019 but Thomas would not sign the PIP. The document is not a performance evaluation.

14. Complainant stated that from 7:00 a.m. to 8:30 a.m. she worked in the 300 Building and she answered all mailroom service group e-mails and provided any supplies that were ordered. Complainant stated that from 9:00 a.m. to 12:00 p.m., she worked at the 200 Building and she scanned all incoming shipments of all kinds from UPS, FedEx, Freight and Warehouse/Store orders; helped employees/managers find or track down their lost packages; e-mailed all the advertising/purchasing teams that their packages arrived and which storage room it was stored. Complainant stated that from 12:00 p.m. to 4:00 p.m. she worked at the 300 Building and she processed all shipments for Information Technology (IT) Departments, advertising/purchasing departments; international shipments and freight shipments with invoices for IT/Loss Prevention Departments. Complainant stated that she processed shipment for the whole campus shipping requests. Complainant stated that the IT Department was the worst, because it had special projects for stores and it was two hours' worth of work for one person. Complainant stated that she also sorted, delivered, did meter mails, look ups and drove the van to drop off mail/packages/orders at Walgreens University and she supplied orders for four buildings.

15. Complainant stated that on November 13, 2018, Stephanie Bristow harassed her about a package that was lost and belonged to Kristen Schaefer. Complainant stated that Bristow tried to blame her for the lost package. Complainant stated that Bristow had the tracking number and she tried to find her name on that package that she signed for. Complainant stated that the package showed someone else's name and her name was not on it. Complainant stated that this was ongoing until January 2019 and then, someone found the package. Complainant stated that Stephanie Peters was in the room and heard her and Bristow arguing about the tracking. Complainant stated that she told Bristow that she was not there the day that the package was scanned and that is why her name is not on the tracking system and she also told Peters the same thing. They checked the calendar and she was off that day but Peters did not do anything about this. Complainant stated that

Charge No.: 2019CF2842
Page 6 of 41

Bristow also blamed her for a different package that was marked the wrong mail stop number. Complainant stated that she told Bristow that it was not her handwriting but she harassed her about it and got angry about it. **Group Exhibit F** is e-mail correspondence between November 13, 2018 and January 9, 2019 regarding a lost package. On November 13, 2018, Kristen Schaefer e-mailed Kerry Martin and asked him to please bring packages to MS #2231. Schaefer indicated that these are office supplies or hardware, not samples. Martin forwarded the e-mail to Complainant and she asked Martin which storage room. Complainant e-mailed Stephanie Bristow on November 13, 2018 and stated, "This helps a lot. Nothing was marked. Let's talk about this tomorrow." At 6:24 p.m. on November 13, 2018, Bristow e-mailed Complainant and indicated that they do not need to talk about Kerry not writing on the packages the same way she does and everyone would learn the process on Friday and the training was already on the calendar. At the end of the e-mail, Bristow stated, "Thank you. I appreciate your help." On January 9, 2019, Bristow sent an e-mail to Melissa Thomas, Complainant, Juanita Barrera and Kerry Martin and she asked who signed for the package indicated below using the verbiage "200 Wilmot Mail."

16. Complainant stated that on November 15, 2018, Stephanie Bristow harassed her to do the water cases order. Complainant stated that Bristow told her to put the skid of 84 water cases in the van by using the forklift. Complainant stated that she told Bristow that she had no experience with a forklift and that she was not comfortable doing it and she did not want to hurt anyone or herself or the property. Complainant stated that Bristow insisted that she do it and said, "Go do it, it needs to be done." **Exhibit G** is e-mail correspondence between Stephanie Bristow, Complainant, Kerry (Kieran) Martin, and Stephanie Peters. The e-mail correspondence is dated November 14, 2018 and November 15, 2018. On November 14, 2018, Bristow asked Martin to teach Complainant how to use the pallet lift so that she would know how to use it in the future and she asked Complainant to please tell Martin if she wanted to take the items to Walgreens University tomorrow or Friday and Martin would show her how to use the pallet lift. On November 15, 2018, Complainant e-mailed Stephanie Peters and stated, "I'm sorry to say, I'm not comfortable using the large lift. I should not be forced to use it. I'm not certified to use that kind of lift."

17. Complainant stated that operating a forklift and transporting water cases are not in her job description. **Group Exhibit D** is the job description for the position of SOSPM. The job description does not indicate that operating a forklift is a basic qualification. The job description does indicate that the SOSPM substitutes for other Mail Services employees, including Drivers, as needed. The job description does not indicate that a SOSPM is responsible for transporting water cases. **Group Exhibit E** is a Performance Improvement Plan (PIP) for Melissa Thomas. Under the heading of "On the Job Trainings," it indicates that Forklift Training was held on December 13, 2018.

18. Complainant stated that on November 26, 2018, Stephanie Bristow came over to where she was working at the 200 Building and she had a tub of look ups. Complainant stated that Bristow came to her desk and dropped the tub next to her leg and she told her to do the look ups while she was there in a very mean, angry tone. Complainant stated that Bristow abruptly left before she could explain to her that she could not do it at the 200 Building, because there were too many packages to handle. Complainant stated that Bristow ignored

Charge No.: 2019CF2842
Page 7 of 41

her and acted like a deaf person. Complainant stated that she saw Stephanie Peters off campus and she spoke to her about it. Complainant stated that Peters said that she could not do anything about it and that everyone must do look ups.

19. Complainant stated that on November 27, 2018, she was doing the look ups on a cart and she had the look ups spread out. Complainant stated that Stephanie Bristow came walking by, grabbed the cart and told her to take the look ups off the cart and put them on Complainant's desk. Complainant stated that the cart was brand new and it was given to her by Stephanie Peters. Complainant stated that her co-worker, Melissa, heard Bristow say, "The carts don't belong to Lynn." Complainant stated that there are many other carts in the mailroom that Bristow could have used.

20. Complainant stated that on February 8, 2019, Stephanie Bristow kept texting her and other teams, addressing issues, ordering issues and scheduling tasks on a daily basis and texting her to come back to the 300 Building and do more work. Complainant stated that she had no break or bathroom break. Complainant stated that she sent out an e-mail to Bristow, Stephanie Peters and the team. Complainant stated that she informed them that her cell phone was no longer in use and that she would be getting a new cell phone so that they would know why she was not responding. Complainant stated that Bristow made a big issue about her having no cell phone. Complainant stated that she told Bristow that she could contact her through work e-mail. Complainant stated that on February 28, 2019, Bristow sent her an e-mail and asked her for her cell phone update. Complainant stated that Bristow verbally harassed her at the 200 Building about her cell phone and that she could not reach her. **Group Exhibit H** is e-mail correspondence between Complainant, Stephanie Bristow, Melissa Thomas, Juanita Barrera, Kerry Martin and Stephanie Peters. The e-mail correspondence is dated February 8, 2019 and February 28, 2019. On February 8, 2019, Complainant sent an e-mail to Bristow, Thomas, Barrera, Martin and Peters and informed them that her cell phone was no longer in use and that she would be getting a new phone. Bristow responded the same day and thanked Complainant for the notice. Bristow asked that Complainant please be sure to provide them with her updated cell phone number when she has it. Complainant responded and informed all that she would be using her husband's cell phone for the time being and he did not want it to be shared as it is his personal cell phone and he does not want her work stuff on it. On February 28, 2019, Bristow e-mailed Complainant and stated, "I realized I never got an updated cell phone number from you. Can you please provide me with an updated cell phone number?"

21. Complainant stated that she feels that she was subjected to harassment because of her sex and disability, because Stephanie Bristow wanted to prove that four people can do 10-man jobs. Complainant stated that Bristow wanted to save money by having less employees in the mailroom. Complainant stated that Bristow's harassing behavior towards her was to make her quit her job by mocking her disability and humiliating her so that she would quit her job. Complainant stated that Bristow did not communicate with her. Complainant stated that Bristow would tell other team members to talk to her. Complainant stated that Bristow did not give her the normalcy of a working relationship. Complainant stated that Bristow would tell her team members, "Tell her what I said," and then she would leave. Complainant stated that Bristow would yell at her and point at things. Complainant stated

Charge No.: 2019CF2842
Page 8 of 41

that when she tried to talk to Bristow, she would roll her eyes at her. Complainant stated that Bristow would mock her disability, as she would mouth words with no voice. Complainant stated that Bristow would act like a deaf person, saying, "Umm, umm," and then ignored her.

22. Complainant stated that during the four months she worked with Stephanie Bristow, Bristow said many times, "Lynn can't hear. She's deaf. Please talk to her and let her know what I'm saying." Complainant stated that it was like Bristow did not want to be bothered to explain the procedures to her. Complainant stated that Bristow did not have the patience to talk to her or answer her questions, so she would have someone else talk to her for her. Complainant stated that when something went wrong, Bristow would blame her disability for the mistakes that were made or for anything that was misunderstood and she used her disability as an excuse to make it look like she could not do her job. Complainant stated that several times, when trying to communicate with her, Bristow rolled her eyes at her, showing no interest.

23. Complainant stated that all the Mail Clerks were harassed in some manner. Complainant stated that Melissa Thomas, Juanita Barrera and Kerry Martin were all harassed by Stephanie Bristow but they would know specifically what type of harassment they were subjected to. **Group Exhibit I** is an e-mail from Kieran (Kerry) Martin to Alan Nielsen and a letter to Employee Relations. The e-mail is dated March 18, 2019. Martin informed Nielsen that he wanted to inform him about the working conditions in the mailroom since Amanda took over the department from Human Resources. Martin indicates that at the bottom of page one that Stephanie Peters took over and she seemed to want to work with them and then Stephanie Bristow was brought on as their boss. The second paragraph on page one indicates that the department was taken down to four employees from 14. On the second page, Martin indicated that the four remaining employees had an increased workload and stress level but they had to also teach Bristow the department. Martin indicated that Bristow's management style is fear and intimidation which is demonstrated by her poor leadership skills, feeling unappreciated and undervalued and talked down to. The fourth paragraph on page two indicates that within one month and a half, all four employees were given verbal warnings, written warnings and then put on performance plans. Martin indicates that they all reached out to Henderson, an HR Employee Relations Specialist about the working conditions. Martin stated, "I now believe that the plan was in place for Sodexo to take over the mailroom but feel strongly that the four of us did not need to be treated this unfairly." Martin's letter to Employee Relations basically states the same as his e-mail to Alan Nielsen.

24. Complainant stated that she reported Stephanie Bristow to Stephanie Peters on November 13, 15 and 26, 2018. Complainant stated that she verbally informed Peters about the harassment she was being subjected to by Bristow.

25. Kieran Martin (non-disabled, male) Former Mailroom Clerk, stated that he worked for Respondent for 29 years. Martin stated that the Mail Department used to employ 15 individuals and then, the department was cut down to four employees. Martin stated that the four employees were him, Complainant, Melissa Thomas and Juanita Barrera. Martin stated that Stephanie Bristow was brought in as Manager and he saw "the writing on the

Charge No.: 2019CF2842
Page 9 of 41

wall." Martin stated that Bristow's managerial style was to micro-manage them and he, Thomas, Complainant and Barrera were not used to being micro-managed. Martin stated that Bristow's style was also confrontational and Complainant's and Thomas' personality did not fit with a confrontational managerial style as Complainant and Thomas tended to "push back."

Martin stated that he, Melissa Thomas, Complainant and Juanita Barrera went to Human Resources and they e-mailed Stephanie Peters and a boss above Peters about Stephanie Bristow's managerial style. Martin stated that he was not involved in the report in which Bristow allegedly took Respondent's mail home. Martin stated that Complainant said that she saw Bristow taking mail home. Martin stated that it was not fun working for Respondent any longer and he voluntarily quit on the last day of February 2019.

Martin stated that although the work environment was hostile, he would not categorize it as discriminatory or that illegal harassment occurred. Martin stated that he never heard Stephanie Bristow make any negative comments about Complainant's disability. Martin stated that although Complainant was deaf, they were able to communicate with her. Martin stated that it was a hostile work environment due to Bristow's tendency to micro-manage them and her confrontational management style. Martin stated that he believes that Bristow was brought in to get rid of them, so Respondent could hire other individuals at a cheaper salary.

26. Melissa Thomas (non-disabled, female) Former Mailroom Clerk, stated that there used to be 14 employees in the Mail Department but Respondent got rid of ten and kept four employees, which included her, Complainant, Kieran Martin and Juanita Barrera. Thomas stated that she, Martin, Complainant and Barrera sorted and delivered mail. Thomas stated that they met Stephanie Bristow on October 1, 2018. Thomas stated that Bristow started working for Respondent as a contracted employee but in November 2018, she became the Manager. Thomas stated that Bristow was the most horrible person she has ever worked for. Thomas stated that Bristow treated all four of them badly but in different ways. Thomas stated that Bristow would resort to name calling and throwing trays in the mail department. Thomas stated that for example, Bristow would say, "Lynn can't hear. I can't talk to her," and if Complainant came in with a cough, Bristow would say, "Keep her away from me. She might be contagious." Thomas stated that it was clear that Bristow was brought in by Respondent to get rid of the four of them. Thomas stated that she filed a complaint with the Equal Employment Opportunity Commission (EEOC) but the EEOC told her that her complaint did not meet the criteria for filing a complaint through the EEOC. Thomas stated that she also hired an attorney.

Thomas stated that Stephanie Bristow did not know anything about their jobs in the mail department. Thomas stated that Kieran Martin worked for Respondent for 29 years, she worked for Respondent for 19 years, Complainant worked for Respondent for 15 years and Juanita Barrera worked for Respondent for 23 years and they all knew what their job duties were. Thomas stated that as a matter of fact, she, Complainant, Martin and Barrera trained Bristow, because she knew nothing about their jobs. Thomas stated that if Bristow had personal issues going on at home, she would take it out on them when she came to work.

Charge No.: 2019CF2842
Page 10 of 41

Thomas stated that Bristow would call them "dummies," and tell them that they did not know how to do their jobs.

Thomas stated that Complainant worked between two buildings and she came back to their building at noon. Thomas stated that it took Complainant about ten minutes to walk back to their building and if she told Stephanie Bristow that she stopped to use the bathroom, Bristow would tell Complainant that if she was going to the bathroom, she had to ask Bristow first. Thomas stated that they did not get the opportunity for their 15-minute breaks. Thomas stated that Stephanie Bristow treated all of them badly. Thomas stated that Bristow gave her the hardest jobs to do and she got into trouble for everything she did. Thomas stated that one time, she was waving her arms to get Complainant's attention and Bristow told her that she was not supposed to do that and that Complainant was deaf and it was disrespectful for her to wave her arms at Complainant. Thomas stated that Complainant even told Bristow that it was okay and that is how she got Complainant's attention. Thomas stated that Complainant was assigned to bins of mail on Monday and Friday and she, Kieran Martin and Juanita Barrera were assigned to the other three days. Thomas stated that Bristow was a horrible boss and she was horrible to all of them.

Thomas stated that Stephanie Bristow was throwing away mail that she was not supposed to throw away and she, Complainant and Juanita Barrera reported Bristow to Doris (last name unknown) Compliance and to Employee Relations. Thomas stated that Employee Relations told them that they needed to report it to Stephanie Peters, Director and to Peters' Supervisor. Thomas stated that they did report this to Peters and to Peters' Supervisor but nothing was ever done. Thomas stated that Bristow told her that she was a very disrespectful employee and that she needed to read the employee handbook. Thomas asked Bristow to please provide her with an employee handbook. Thomas stated that after they reported Bristow, they had to do a class online about HIPAA and Compliance. Thomas stated that after Complainant was discharged in March 2019, she and Juanita Barrera were placed on Performance Improvement Plans (PIPs). Thomas stated that Kieran Martin was gone by this time too. Thomas stated that Respondent got rid of tons of employees at the Corporate Office. Thomas stated that Sodexo did part of the mail department's job duties. Thomas stated that Respondent should have just been upfront with them and told them that due to restructuring, they were being laid off or discharged. Thomas stated that she was discharged in April 2019 for insubordination and Juanita Barrera was also discharged.

**B.**   **Respondent's Evidence:**

1.   Stephanie Bristow (disabled, female) Manager of Corporate Campus Building Operations, stated that Respondent's records indicate that Complainant was hired by Respondent on December 15, 2003 as a Mailroom Clerk Jr. Bristow stated that Respondent's records indicate that Complainant was promoted to Mailroom Clerk on April 30, 2006. Bristow stated that on November 12, 2018, Complainant assumed the job title of Specialist Office Support Print and Mailroom (SOSPM)[3].

---

[3] SOSPM will be used to indicate the job title of Specialist Office Support Print & Mailroom throughout the report.

Charge No.: 2019CF2842
Page 11 of 41

2.     Bristow stated that she began working for Respondent as a contracted employee in July 2018. Bristow stated that in November 2018, she was hired by Respondent for the position of Corporate Campus Building & Operations and Complainant began reporting to her on November 8, 2018. Bristow stated that Stephanie Peters, Director, was her immediate Supervisor and Amanda Quinton, Senior Director, was Peters' immediate Supervisor.

3.     Bristow stated that Respondent is committed to providing equal employment opportunities to all of its employees and applicants. Bristow stated that Respondent maintains and enforces policies that prohibit discrimination and harassment on the basis of race, color, religion, national origin, citizenship status, sex, sexual orientation, gender identity, age, disability, veteran status or genetic information. **Group Exhibit O** is Respondent's policy against Harassment and Discrimination. The policy provides the purpose of the policy; the scope of the policy; the policy, which indicates that Respondent subscribes to a policy of equal employment opportunity without regard to any protected category, including sex and disability; definition of what constitutes discriminatory conduct; what constitutes sexual harassment and unlawful harassment; how to report; retaliation policy; management responsibilities; and, how to file an external complaint.

4.     Bristow stated that Respondent also maintains a policy for individuals with disabilities. **Exhibit R** is Respondent's Americans with Disabilities Act Policy. The policy states, "The Federal Americans with Disabilities Act applies to qualified individuals with disabilities. Qualified individuals are people who satisfy the skills, experience, educational and other job-related requirements of a position and who can perform the essential functions of the job with or without reasonable accommodation." The policy indicates that discriminatory and/or differential treatment is prohibited in all aspects of the employment relationship, including hiring, transfer, discipline, job assignment, promotion, termination, training, compensation and performance evaluations.

5.     Bristow stated that Respondent also maintains an internal complaint procedure that explains how an employee can report a complaint of discrimination or harassment. Bristow stated that employees are to report discrimination and/or harassment to their choice of Manager, District Manager, District Asset Prevention Manager, the confidential hotline or the Employee Relations Department at Corporate Headquarters. **Group Exhibit P** is Respondent's Open Door Policy. The third paragraph under the heading of "Policy," on the first page states, "Team members may report complaints of harassment, discrimination and/or retaliation through the Open Door process or by using the reporting procedures described in the Policy Against Harassment and Discrimination." The policy indicates that a team member may speak to their choice of their location manager; their district manager or department director; their loss prevention manager; the HR Shared Services Department; the confidential hotline; their compliance officer; the chief compliance officer; and/or, the senior vice-president and chief human resource officer.

6.     Bristow stated that Respondent does not have any record of Complainant providing Respondent with any medical records regarding her disability. Bristow stated, however, that she was aware of Complainant's disability and she communicated with Complainant mostly through e-mails.

Charge No.: 2019CF2842
Page 12 of 41

7.    Bristow stated that Respondent does not maintain an employee handbook. Bristow stated that all of Respondent's policies are published on Respondent's intranet website and are accessible to and applicable to all of Respondent's employees. Bristow stated that upon being hired, employees receive an authenticator identification and password which gives the employee access to Respondent's intranet website from work or home. Bristow stated that during orientation, Respondent's employees are told about the intranet website and policies and that the employees are expected to read, understand and comply with the policies.

8.    Bristow stated that besides Complainant, Kieran Martin (no known disability, male), Melissa Thomas (no known disability, female) and Juanita Barrera (no known disability, female) held the position of SOSPM. Bristow stated that Complainant, Martin, Thomas and Barrera had the same job duties.

9.    Bristow stated that she did not harass Complainant or any of the other employees. Bristow stated that she was hired to ensure that packages that were shipped to Respondent were delivered and that packages that needed to be shipped, were shipped. Bristow stated that there were many packages that were not shipped.

10.   Bristow stated that she did not deprive any of the employees of their rest break and/or lunch break. Bristow stated that Respondent does maintain a policy for meal breaks and rest breaks. **Group Exhibit Q** is Respondent's policies for uninterrupted meal periods and rest breaks. Respondent's uninterrupted meal periods policy indicates that time spent on a meal period is not working time provided the employee is completely relieved from duty for the entire meal period. The policy states, "Employees who are requested to return to work before their meal period has expired, are to be paid as if they worked the entire meal period." The second policy is for rest and meal periods in Illinois. The policy indicates that if an employee works more than four hours in a day, the employee will be provided with one 15-minute paid rest period and if the employee works at least eight hours in a day, the employee will be provided with two 15-minute rest periods. The meal period policy indicates that if an employee works more than five hours in a day, the employee is given a 30-minute unpaid, uninterrupted meal period and if an employee works more than 7.5 hours in a day, the 30-minute unpaid meal period should begin no later than five hours after the start of the shift.

11.   Bristow stated that "look-ups" are mail that is delivered to Respondent's campus but not addressed to a specific person or mail stop number. Bristow stated that in cases such as this, the employees had to open the mail to find out who or what mail stop number the mail was to be delivered to.

12.   Stephanie Bristow stated that just because the employees may not have liked her managerial style, does not mean that they were harassed. Bristow stated that she did not use any slurs or make negative comments about any protected category. Bristow stated that ensuring that employees perform their job duties is not harassment. Bristow stated that since the mail department was downsized from 14 employees to four, the four remaining employees did have more expectations placed on them.

Charge No.: 2019CF2842
Page 13 of 41

**C.**    **Complainant's Rebuttal:**

1.    Complainant did not provide any additional information other than what was reported in Complainant's Evidence Section for Counts A & B.

**Analysis:**

The investigation revealed that Complainant was not subjected to harassment due to her disability, deafness and/or her sex, female. The investigation revealed that it is uncontested that Complainant was hired by Respondent on December 15, 2003. The investigation revealed that Complainant's position was Specialist, Office Support, Print & Mailroom (SOSPM). The investigation revealed that it is uncontested that three other individuals held the same position as Complainant and the three individuals were Melissa Thomas (non-disabled, female), Kieran (Kerry) Martin (non-disabled, male) and Juanita Barrera (non-disabled, female). The investigation revealed that Complainant contends and witness testimony supports that at one time there were 14 employees in the Mail Department. The investigation revealed that it is uncontested that Respondent was aware of Complainant's disability since the beginning of her employment. It is uncontested that in November 2018, Stephanie Bristow became the Manager of Corporate Campus Building Operations and Bristow was the direct supervisor for Complainant, Thomas, Martin and Barrera.

The incidents that Complainant identifies as harassment are work-related duties that she felt were too much for one person to handle. The investigation revealed that witness testimony supports that Stephanie Bristow's (disabled, female) Manager, managerial style was confrontational and she tended to micro-manage Complainant, Melissa Thomas, Kieran (Kerry) Martin and Juanita Barrera. The investigation revealed that Complainant, Thomas and Martin felt that Bristow was brought in as Manager to get rid of them so that Respondent could replace them with contracted employees. The investigation revealed that Complainant contends that rather than communicate with her, Bristow would ask her co-workers to relay information to her and sometimes, when Complainant tried to communicate with Bristow, Bristow would roll her eyes at her and not listen to her. The investigation revealed that Bristow denied that she subjected Complainant to harassment. The investigation revealed that Bristow contends that she was able to communicate with Complainant and the majority of the time, she e-mailed Complainant to communicate with her. The investigation revealed that Complainant conceded that Bristow treated Melissa Thomas, Kieran (Kerry) Martin and Juanita Barrera in the same or similar manner. The evidence reveals that Respondent maintains a harassment policy and an internal complaint procedure. The investigation revealed that Complainant nor her co-workers filed an internal complaint of illegal harassment.

**Findings & Conclusion-Counts A & B:**

A finding of **Lack of Substantial Evidence** is recommended because:

The evidence reveals that Complainant is a disabled individual as defined within the meaning of the Illinois Human Rights Act. The investigation revealed that it is uncontested that Respondent was aware of Complainant's disability. The investigation revealed that it is uncontested that Complainant began working for Respondent on December 15, 2003. The investigation revealed that at one time Respondent employed 14 employees in the Mail Department. The investigation

Charge No.: 2019CF2842
Page 14 of 41

revealed that the four remaining employees were Complainant, Melissa Thomas (non-disabled, female), Kieran (Kerry) Martin (non-disabled, male) and Juanita Barrera (non-disabled, female). The investigation revealed that the incidents that Complainant identifies as harassment do not rise to the level of illegal harassment. The investigation revealed that witness testimony supports that while Stephanie Bristow (disabled, female) Manager, was not the ideal Supervisor and she micro-managed the employees, her actions were not discriminatory and she did not make any negative comments about any protected category. The investigation revealed that Complainant conceded that Bristow treated Thomas, Martin and Barrera in a similar manner.

There is no evidence of an animus based on disability status and/or sex. There is not substantial evidence that Complainant was subjected to illegal harassment from October 2018 to March 2019, because of her disability, deafness and/or her sex, female.

**Complainant's Allegations-Count C:**

Complainant alleges that she was subjected to harassment on November 26, 2018, in retaliation for engaging in a protected activity. Complainant alleges that she began working for Respondent on December 15, 2003. Complainant alleges that her work performance as Mail/Shipping Clerk met Respondent's expectations. Complainant alleges that on November 15, 2018, she reported Stephanie Bristow's unprofessional conduct towards her to Stephanie Peters, Director, Guest & Team Member Services. Complainant alleges that on November 26, 2018, Stephanie Bristow, assigned her to double "lock-ups." Complainant alleges that the harassment created a hostile and egregious work environment which interfered with her ability to perform her job duties. Complainant alleges that the adverse action occurred within such a short period of time after her complaint that it raises an inference of retaliatory motivation.

**Respondent's Defense-Count C:**

Respondent's articulated, non-discriminatory defense is Complainant was not subjected to harassment and Stephanie Bristow, Manager, had no knowledge of any verbal complaint Complainant may have reported to Stephanie Peters, Director, Guest & Team Member Services.

**Investigation Summary-Count C:**

A.    **Complainant's Evidence:**

1.    See Complainant's Evidence for Counts A & B.

2.    Complainant stated that she contacted Stephanie Peters, Director, via e-mail on November 15, 2018 and she included Stephanie Bristow on the e-mail and she let Peters know that she could not do the forklift to do the water order for Walgreens University that Bristow directed her to do. Complainant stated that she informed Peters that she was uncomfortable and she was not certified to operate a forklift. Complainant stated that Peters said that she wanted to have a face-to-face meeting. Complainant stated that she met with Peters and told her that it was not right for Bristow to be forcing her to operate a forklift and she told Peters how she was treated by Bristow since October. Complainant stated that Peters told her that it was okay and Bristow is learning how to be a manager. Complainant stated that Peters told her that she would talk to Bristow and tell her to tone down her aggressiveness.

Charge No.: 2019CF2842
Page 15 of 41

Complainant stated that Peters and Bristow are friends. Complainant stated that nothing changed.

3.  Complainant stated that on November 26, 2018, Stephanie Bristow decided to split up the "look ups" for the team. Complainant stated that she was assigned to look ups on Monday and Friday. Complainant stated that Monday is double because it has Saturday's mail. Complainant stated that Kerry was assigned to Tuesday; Juanita was assigned to Wednesday; and, Melissa was assigned to Thursday. Complainant stated that she feels that Bristow did this in retaliation for having talked to Stephanie Peters about her behavior towards her.

4.  Complainant stated that she believes that Stephanie Bristow harassed her by giving her more "look-ups" than her co-workers because she reported Bristow to Stephanie Peters and told Peters that Bristow wanted her to use a forklift and how Bristow had been treating her regarding her job duties. Complainant stated that she verbally reported Bristow to Peters on November 13, 15 and on the 26, 2018, after Bristow assigned her to double "look-ups." Complainant stated that on November 13, 2018, she informed Peters that Bristow blamed her for a missing package.

**B.  Respondent's Evidence:**

1.  See Respondent's Evidence for Counts A & B.

2.  Stephanie Bristow (did not engage in a protected activity) Manager, Corporate Campus Building Operations, stated that she had no idea that Complainant spoke to Stephanie Peters, Director. Bristow stated that in late November 2018 or December 2018, Peters discussed with her how everything was going in the mailroom but Peters did not mention any of the employees and it was just a general question about how she felt things were going.

3.  Bristow stated that "look ups" are part of all the SOSPMs job duties. Bristow stated that she does not specifically recall which day each SOSPM was assigned to do "look ups." Bristow stated that again, expecting an employee to perform their job duties is not harassment and she did not retaliate against Complainant and she had no idea that Complainant discussed anything with Stephanie Peters.

4.  Attorney Frank Bear (non-disabled, male) In-house Counsel, stated that on February 11, 2019, Complainant initiated an internal complaint against Stephanie Bristow and she included her mailroom coworkers and alleged that Bristow was creating a toxic work environment based on age. Bear stated that Complainant alleged that Bristow, who is in her 30s, was overworking her and the other employees in her department, who were in their 50s. Bear stated that after an investigation by Human Resources, the complaint was unfounded. Bear stated that Complainant did not complain of discrimination based on disability in this complaint.

5.  Bear stated that on February 12, 2019, a person who identified themselves as "Shannon White" contacted Respondent's Confidential Hotline and alleged that Stephanie Bristow

Charge No.: 2019CF2842
Page 16 of 41

was creating a hostile work environment. Bear stated that the caller did not provide contact information and asked not to have any further involvement in the investigation. Bear stated that Respondent was not able to identify any team member that reported to Bristow with the name "Shannon White."

6.  Bear stated that Respondent does maintain a non-retaliation policy. **Exhibit S** is Respondent's Retaliation Policy. The policy indicates that Respondent does not tolerate retaliation and any employee who retaliates against another employee will be subject to serious disciplinary action, up to and including termination of employment.

**C.    Complainant's Rebuttal:**

1.  Complainant did not provide any additional information other than what was reported in Complainant's Evidence Section for Counts A-C.

**Analysis:**

The investigation revealed that Complainant was not subjected to harassment on November 26, 2018, in retaliation for engaging in a protected activity. The investigation revealed that on November 26, 2018, Stephanie Bristow (did not engage in a protected activity) Manager, assigned her to double "look-ups." The investigation revealed that look-ups are mail that is not addressed to a specific person or mail stop number and therefore, the employees must open the envelope to determine where the mail was to be delivered to. The investigation revealed that Complainant did not engage in a protected activity. The investigation revealed that Complainant contends that she spoke to and sent e-mails to Stephanie Peters, Director, on November 13, 2018, November 15, 2018 and on November 26, 2018 after Bristow assigned her to "look-ups" on two days while her co-workers, Kieran (Kerry) Martin, Melissa Thomas and Juanita Barrera were assigned to "look-ups" on one day. The evidence reveals that on November 15, 2018, Complainant e-mailed Peters and informed her that she was not comfortable using a large pallet lift as Bristow wanted her to do. The investigation revealed that it is uncontested that Complainant was hired by Respondent on December 15, 2003. The investigation revealed that Complainant's position was Specialist, Office Support, Print & Mailroom (SOSPM). The investigation revealed that it is uncontested that three other individuals held the same position as Complainant and the three individuals were Melissa Thomas (non-disabled, female), Kieran (Kerry) Martin (non-disabled, male) and Juanita Barrera (non-disabled, female). The investigation revealed that Complainant contends and witness testimony supports that at one time there were 14 employees in the Mail Department. It is uncontested that in November 2018, Stephanie Bristow became the Manager and the direct supervisor for Complainant, Martin, Thomas and Barrera.

The incidents that Complainant identifies as harassment are work-related duties that she felt were too much for one person to handle. The investigation revealed that Stephanie Bristow denied having any knowledge of any conversation or e-mail correspondence between Complainant and Stephanie Peters in November 2018. The investigation revealed that Bristow contends that "look-ups" are part of a SOSPMs job duties. The evidence reveals that Respondent maintains a non-retaliation policy and if any employee violates the non-retaliation policy, the employee would be disciplined up to and including termination.

Charge No.: 2019CF2842
Page 17 of 41

## Findings & Conclusion-Count C:

A finding of **Lack of Substantial Evidence** is recommended because:

The investigation revealed that Complainant did not engage in a protected activity. The investigation revealed that the complaints Complainant made to Stephanie Peters, Director, were regarding job-related duties and that she felt that she was being over-worked. The investigation revealed that at one time Respondent employed 14 employees in the Mail Department. The investigation revealed that the four remaining employees were Complainant, Melissa Thomas (non-disabled, female), Kieran (Kerry) Martin (non-disabled, male) and Juanita Barrera (non-disabled, female). The investigation revealed that the incident that Complainant identifies as harassment do not rise to the level of illegal harassment. The investigation revealed that Complainant conceded that Bristow also assigned Thomas, Martin and Barrera to "look-ups," but on one day while she was assigned on two days.

There is no evidence of a retaliatory motivation by Respondent. There is no evidence that Complainant engaged in a protected activity. There is not substantial evidence that Complainant was subjected to illegal harassment on November 26, 2018, in retaliation for engaging in a protected activity.

## Complainant's Allegations-Count D:

Complainant alleges that Respondent failed to provide her with a reasonable accommodation from December 2018 and February 2019, due to her disability, deafness. Complainant alleges that she began working for Respondent on December 15, 2003. Complainant alleges that her work performance as Mailroom Clerk met Respondent's expectations. Complainant alleges that in December 2018, she told Stephanie Bristow, Manager, that she needed an accommodation in order to communicate, she was given a TV screen but she never received any training for how to use it. Complainant alleges that her disability was unrelated to her ability to perform the essential functions of her job with or without an accommodation.

## Respondent's Defense-Count D:

Respondent's articulated, non-discriminatory defense is that Respondent has no record of Complainant making a formal request for a reasonable accommodation but Respondent provided Complainant with specialized telephonic equipment at her workstation and an interpreter at meetings.

## Investigation Summary-Count D:

**A.** **Complainant's Evidence:**

1. See Complainant's Evidence for Counts A-C.

2. Complainant stated that when she worked at the 200 Building from 9:00 a.m. to 12:00 p.m., all the incoming packages were to be stored in assigned storerooms for purchasing departments. Complainant stated that in or around December 2018, Stephanie Bristow wanted her to call the purchasing teams to let them know that their packages arrived.

Charge No.: 2019CF2842
Page 18 of 41

Complainant stated that she told Bristow that she is deaf and that she cannot use the phone. Complainant stated that she told Bristow that she would need an accommodation and Bristow told her that she would talk to Stephanie Peters about it. Complainant stated that up until then, she had been e-mailing teams to inform them of their packages.

3.   Complainant stated that after many weeks, a TV screen was installed next to her desk/phone. Complainant stated that this was in December 2018. Complainant stated that the Information Technology (IT) Technician told her that Stephanie Bristow knows that it was set up for her. Complainant stated that she asked about training for how to use it. Complainant stated that she did not receive training, nor access or passwords to use. Complainant stated that she asked Bristow but she was never provided with training and therefore, she continued to use e-mails to inform the team of their packages. Complainant stated that Bristow never followed up with her on this and she never wanted to communicate about it. Complainant stated that when she questioned it, Bristow became frustrated and did not want to talk to her because she is deaf.

4.   Complainant stated that the other employees in her department, Melissa Thomas, Kerry Martin and/or Juanita Barrera, were not disabled and they did not need an accommodation.

**B.   <u>Respondent's Evidence:</u>**

1.   See Respondent's Evidence for Counts A-C.

2.   Stephanie Bristow (disabled) Manager, Corporate Campus Building & Operations, stated that she did not have any problem communicating with Complainant through e-mail and she did not have a problem with Complainant communicating with others through e-mail. Bristow stated that Complainant did not ask her for an accommodation. Bristow stated, however, that Respondent provided a specialty device for people who are deaf. Bristow stated that the Audio/Visual Team set up the device for Complainant and trained her on this. Bristow stated that she does not know if the device required a password.

Staff Note:
On October 1, 2020, staff requested that Respondent provide a statement to indicate if Complainant requested a reasonable accommodation; the date of the request; what Complainant requested and indicate if it was approved or denied. Staff requested that if Complainant's request was approved, please provide the date that she received the reasonable accommodation and if it was denied, provide the reason for the denial. On October 9, 2020, Respondent responded to staff's requests and reported that Complainant does not have any record of Complainant making a formal request for a reasonable accommodation. Respondent reported that Respondent provided Complainant with a specialized telephonic equipment at her workstation, an interpreter at meetings and/or provided Complainant with meeting notes in writing to support her.

3.   Bristow stated that Melissa Thomas, Kieran Martin and/or Juanita Barrera did not disclose any disability and no other employee requested an accommodation.

Charge No.: 2019CF2842
Page 19 of 41

4.     Bristow stated that Respondent does maintain a policy for reasonable accommodations. **Group Exhibit T** is Respondent's Reasonable Accommodation Policy. The policy indicates that Respondent is committed to providing equal employment opportunities for persons with disabilities. The first paragraph states, "An applicant or team member with a disability may request a reasonable accommodation to enable him or her to apply for employment or to perform the essential functions of his or her job." The policy indicates that team members should request an accommodation from the team member's manager and the manager should immediately contact the Employee Relations Department.

**C.    Complainant's Rebuttal:**

1.     Complainant did not provide any further information other than what was presented in Complainant's Evidence Section for Counts A-D.

**Analysis:**

The investigation revealed that Complainant began working for Respondent on December 15, 2003. The investigation revealed that it is uncontested that Respondent was aware of Complainant's disability. The investigation revealed that Complainant contends that in December 2018, Stephanie Bristow (disabled) Manager, wanted her to call purchasing teams when their packages arrived. The investigation revealed that Complainant contends that she informed Bristow that she could not speak on the phone due to her disability and she needed an accommodation. The investigation revealed that Complainant contends that a TV screen was installed next to her phone by Information Technology (IT) but she was never trained on how to use it. The investigation revealed that Complainant contends that she could perform her job duties with or without a reasonable accommodation.

The investigation revealed that Respondent contends that Complainant did not make a formal request for an accommodation. The investigation revealed that Stephanie Bristow contends that the Audio/Visual Team installed a specialty device and trained Complainant on the device. The investigation revealed that Complainant conceded that no other SOSPM requested an accommodation and Respondent provided the SOSPM with an accommodation. The evidence reveals that Respondent does maintain a policy for requesting a reasonable accommodation and once an employee makes a formal request for an accommodation, Respondent engages in an interactive process with Complainant to determine the type of accommodation that is necessary. The investigation revealed that Respondent contends that Complainant did not submit any medical records to Respondent regarding her disability.

**Findings & Conclusion-Count D:**

A finding of **Lack of Substantial Evidence** is recommended because:

The investigation revealed that Complainant worked for Respondent for 15 years and did not require an accommodation due to her disability, deafness. The evidence reveals that Complainant is a disabled individual as defined within the meaning of the Illinois Human Rights Act. The investigation revealed that although there is conflicting testimony as to whether Complainant

Charge No.: 2019CF2842
Page 20 of 41

requested an accommodation in December 2018 after Stephanie Bristow (disabled) Manager, allegedly informed her that she wanted Complainant to call purchasing teams when their packages arrived rather than e-mail them, Complainant did not provide the name of another employee who was granted an accommodation. The investigation revealed that Complainant conceded that she was able to perform her job duties with or without an accommodation. The investigation revealed that Complainant conceded that a TV screen was installed on her desk but she was never trained. The investigation revealed that Bristow contends that the Audio/Visual Team installed a specialty device for Complainant to use and to her knowledge, the Audio/Visual Team trained Complainant on the device. The investigation revealed that although there is conflicting testimony regarding the training, Complainant did not suffer any adverse action from Respondent and continued to utilize e-mail to communicate. The investigation revealed that Bristow is also a disabled individual.

There is no evidence of an animus based on disability status. There is not substantial evidence that Respondent failed to provide Complainant with a reasonable accommodation due to her disability, deafness.

**Complainant's Allegations-Counts E & F:**

Complainant alleges that she was issued a written warning on February 13, 2019, because of her disability, deafness (Count E) and her sex, female (Count F). Complainant alleges that she began working for Respondent on December 15, 2003. Complainant alleges that on February 13, 2019, she was issued a written warning by Stephanie Bristow (disabled, female) Manager. Complainant alleges that the reason given by Bristow was for misconduct. Complainant alleges that similarly situated, non-disabled and/or male employees were not issued a written warning for the same or similar reason.

**Respondent's Defense-Counts E & F:**

Respondent's articulated, non-discriminatory defense is that Complainant was issued a written warning on February 13, 2019, for unprofessional conduct.

**Investigation Summary-Counts E & F:**

**A.    Complainant's Evidence:**

1.    See Complainant's Evidence for Counts A-D.

2.    Complainant stated that on February 13, 2019, she and her team members were all written up on the same day. Complainant stated that this was retaliation for reporting Stephanie Bristow to Compliance. **Group Exhibit J** is three written warnings. The first warning was issued to Complainant by Stephanie Bristow on February 13, 2019. The warning indicates that Complainant was issued for misconduct after coaching and a verbal warning for unprofessional misconduct (discussed 1/14/19). The second warning was a final written warning issued to Kieran (Kerry) Martin on February 13, 2019. The warning indicates that after ongoing coaching and a verbal warning regarding safety misconduct, continued

unprofessional misconduct led to a final written warning on the basis of misconduct in the workplace. The third written warning was issued to Melissa Thomas on December 20, 2108 for unprofessional conduct and disrespectful behavior for yelling in an extremely loud and aggressive tone of voice across the room at fellow team member, Complainant. The warning states, "Lynn Hayes is a deaf employee, therefore Melissa yelling at her is counterproductive to effective communication to being unprofessional." The last warning was issued

3.     Complainant stated that her write-up indicated that she engaged in disruptive behavior regarding an e-mail to an employee, Collin Kapinos. Complainant stated that she had done Kapinos' projects every day. Complainant stated that Kapinos had brought down the job batch early, the night before on her desk at the 200 Building. Complainant stated that Stephanie Bristow contacted her by e-mail and asked her why the job batch was not done. Complainant stated that she ran into Kapinos and asked him in person why he did not let her know to ship his job batch out. Complainant stated that Kapinos said that it was not a hot job and it did not need to go out the night before, so he put it on her desk early on his way out to go home. Complainant stated that she explained this to Bristow but she did not believe her. Complainant stated that she e-mailed Kapinos and cc'd Bristow to have Kapinos confirm that the job was not a hot job. Complainant stated that Kapinos e-mailed back to her and Bristow confirming that it was early. Complainant stated that Bristow ended up writing her up for misconduct. **Group Exhibit K** is e-mail correspondence between Complainant, Collin Kapinos and Stephanie Bristow. The e-mail correspondence is dated February 6, 2019 and February 7, 2019. On February 6, 2019, Kapinos sent an e-mail to Mail Services and he cc'd Complainant and Stephanie Bristow and he indicated that he attached the shipping list for RAD C2 Wave 30 and RAD C2 Wave 24 V3. On February 7, 2019, Mail Services responded to Kapinos and stated that this came down to the mailroom late yesterday and the driver had already left for pick-ups and it would be shipped today. Bristow e-mailed Complainant and stated, "I have mentioned this to you before but as a reminder, there is a daily 5PM pick up as well as a 3:30 PM pick up for FedEx express. Anything that arrives late in the day please ensure you complete before leaving at 4:30 p.m. and set outside for pickup." Complainant responded to Bristow and informed her that Kapinos left it on her desk at 200 and he did not let anyone know it was on her desk. On February 7, 2019, Complainant e-mailed Kapinos and cc'd Bristow and stated, "Please confirm that you left those 2 jobs on my desk in the 200 building mailroom late yesterday. And, you knew it was late for a driver to pick it up. We talked about it this morning when you came down to drop off the laptops for me for shipping them out. You were aware that it wasn't processed. I want Stephanie to understand that it wasn't at 300 building mail room for processing at that time." Kapinos responded and stated, "I brought them down last afternoon yesterday. I did not expect them to go out till today!"

4.     Complainant stated that she believes that she received a written warning due to her disability and sex, because of the pattern of harassment she received from Stephanie Bristow which she explained earlier.

Charge No.: 2019CF2842
Page 22 of 41

**B.**     **Respondent's Evidence:**

1.     See Respondent's Evidence for Counts A & B and D.

2.     Stephanie Bristow (non-disabled, female) Manager, Corporate Campus Buildings & Operations, stated that on January 10, 2019, a driver for United Parcel Services (UPS) filed a complaint against Complainant with Respondent's management because she was rude, difficult to work with and disrespectful. Bristow stated that the driver alleged that Complainant was very angry because UPS was delivering packages to places where they were not supposed to go and she alleged that UPS drivers were ignoring her instructions. Bristow stated that she verbally warned Complainant to remember that she was in a customer-facing role that required her to conduct herself according to Respondent's code of conduct and in this situation with the UPS driver she did not and that her behavior was unprofessional.

3.     Bristow stated that on February 6, 2019, Complainant received an e-mail from a team member who indicated that he had placed packages in the mailroom for delivery. Bristow stated that Complainant did not respond to the team member that his packages would not be mailed out that day due to the time he left the package and that his package would be mailed the next morning.

4.     Bristow stated that she sent Complainant an e-mail on February 7, 2019 to remind her that there were two FedEx express pickups in the afternoon and to please ensure that she was doing everything to process all packages before leaving the office for the day at 4:30 p.m. Bristow stated that when Complainant received her e-mail, she e-mailed the team member who had left the packages in the mailroom asking that the employee confirm that he understood that the packages would not be mailed out so that Stephanie Bristow would understand that he was not expecting the packages to be shipped. Bristow stated that Complainant's e-mail to the team member was unprofessional and unacceptable.

5.     Bristow stated that on February 11, 2019, Complainant was working on separating and sending out Champion of Champions posters to mail stops and she became very distressed when showing her the mail stops that could not be located. Bristow stated that she asked Complainant what steps she followed to try and find the correct mail stops for those that were incorrect. Bristow stated that Complainant asked her, "Aren't you listening. I've told you three times now."

6.     Bristow stated that on February 13, 2019, Complainant was issued a written warning for misconduct.

7.     Bristow stated that Complainant's disability and/or sex had nothing to do with her being issued a written warning.

8.     Bristow stated that Melissa Thomas (no known disability, female) received written warnings on February 13, 2019 and in December 2018 for misconduct and for unprofessional conduct. **Group Exhibit U** is a written warning issued to Melissa Thomas.

Charge No.: 2019CF2842
Page 23 of 41

       The disciplinary record indicates that Thomas received a final written warning on February 13, 2019 for misconduct.

**C.**    <u>**Complainant's Rebuttal:**</u>

1.    Complainant did not provide any further information other than what was previously presented in Complainant's Evidence Section for Counts A-F.

<u>**Analysis:**</u>

The investigation revealed that Complainant did not receive a written warning on February 13, 2019, because of her disability, deafness or her sex, female. The investigation revealed that Complainant worked for Respondent since December 15, 2003. The investigation revealed that Complainant contends and witness testimony supports that the Mail Department formerly employed 14 to 15 individuals. The investigation revealed that by 2018, there were four employees remaining in Mail Services. The investigation revealed that the four employees were Complainant, Kieran (Kerry) Martin (non-disabled, female), Melissa Thomas (non-disabled, female) and Juanita Barrera (non-disabled, female). The investigation revealed that it is uncontested that in November 2018, Stephanie Bristow (disabled, female) became the Manager and Complainant's, Martin's, Thomas' and Barrera's direct supervisor. The evidence reveals that in January 2019, Complainant received a verbal warning after a United Parcel Service (UPS) Driver filed a complaint against her. The evidence reveals that on February 13, 2019, Complainant received a written warning for misconduct. The investigation revealed that Complainant conceded that all four of the employees in Mail Services received a written warning on February 13, 2019. The evidence reveals that Martin and Thomas received a final written warning on February 13, 2019.

<u>**Findings & Conclusion-Counts E & F:**</u>

A finding of <u>**Lack of Substantial Evidence**</u> is recommended because:

The investigation revealed that it is uncontested that Complainant worked for Respondent for 15 years. The investigation revealed that in November 2018, Stephanie Bristow (disabled, female) became the Manager and the direct supervisor of the four remaining employees in Mail Services. The investigation revealed that three of the four Mail Services employees found Bristow's managerial style intimidating and over-bearing. The evidence reveals that in January 2019, Complainant received a verbal warning after a United Parcel Services (UPS) Driver complained about her conduct. The evidence reveals that on February 13, 2019, Bristow issued Complainant a written warning for misconduct. The evidence reveals that it is uncontested that Kieran (Kerry) Martin (non-disabled, male) and Melissa Thomas (non-disabled, female) also received a written warning on February 13, 2019.

There is no evidence of an animus based on disability status and/or sex. There is not substantial evidence that Complainant was issued a written warning on February 13, 2019, because of her disability, deafness and/or her sex, female.

Charge No.: 2019CF2842
Page 24 of 41

## Complainant's Allegations-Count G:

Complainant alleges that she was issued a written warning on February 13, 2019, in retaliation for engaging in a protected activity. Complainant alleges that she began working for Respondent on December 15, 2003. Complainant alleges that on February 11, 2019, she engaged in a protected activity when she reported Stephanie Bristow, Manager, for a violation. Complainant alleges that on February 13, 2019, she was issued a written warning by Stephanie Bristow, Manager. Complainant alleges that the reason given by Bristow was for misconduct. Complainant alleges that Respondent's adverse action followed her participation in a protected activity within such a short period of time that it raises an inference of retaliatory motivation.

## Respondent's Defense-Count G:

Respondent's articulated, non-discriminatory defense is that Complainant was issued a written warning for unprofessional conduct.

## Investigation Summary-Count G:

### A.     Complainant's Evidence:

1.      See Complainant's Evidence for Counts A-F.

2.      Complainant stated that on February 11, 2019, she and her team members decided to do the right thing. Complainant stated that it took them a while to think and make the right decision but they reported to Compliance that Stephanie Bristow took home a few tubs of mail that contained personal letters, Social Security checks, pharmacy checks, payroll, taxes, legal, and health information. Complainant stated that taking home mail is a violation of HIPPA. Complainant stated that Bristow took the tubs of mail home on December 14, 2018. Complainant stated that she and her team members saw Bristow take tubs out to the back door dock to her car and load them in her car. Complainant stated that when Bristow came back the following Monday, she came back with less tubs and obviously some mail had been tossed and some mail was marked with mail stops on it. Complainant stated that Bristow told the team, "I had to take it home to do the look ups so you all can sort the mails. Some mails were tossed." Complainant stated that Compliance reported this to Doris Pigott and Pigott said that it is not right and no one is supposed to take any Walgreens' mail home and all mail belongs to Respondent and should stay in the building. Complainant stated that Pigott reported it to her Manager, Anne Kirwan. Complainant stated that Kirwan never contacted any of the team members and they never heard from any team in Compliance. Complainant stated that she e-mailed Doris Pigott and asked her for the status of their report and Pigott told her to go online and report it and that she could not talk about it. Complainant stated that they all had to take Compliance training online. **Exhibit L** e-mail correspondence between Complainant, Doris Pigott, Melissa Thomas and Juanita Barrera on February 14, 2019. At the bottom of the page is a date of February 11, 2019. On February 14, 2019, Doris Pigott e-mailed Complainant, Thomas and Barrera and she informed them that she cc'd Anne Kirwan, her Manager, as they spoke last Monday about Bristow bringing mail home. Pigott indicated that this is a

Charge No.: 2019CF2842
Page 25 of 41

clear violation of Respondent's policy. Pigott asked if they can provide the dates and times of day they witnessed her removing mail and bringing it back. Complainant responded and stated, "I need to add, also, they have taken home FedEx labels-those contain people's names for payroll checks. It should not have been taken home to label the Fed Ex envelopes then bring it back for stuffing. Some cases they take the Fed Ex shipment all to the Fed Ex stores for drop off. I highly think that's not appropriate to do business. We have contract with Fed Ex driver to pick it up from our location for safety and privacy purposes." Complainant did not provide the dates for when they saw Bristow taking mail home.

3.      Complainant stated that on February 13, 2019, she received a written warning from Stephanie Bristow for alleged misconduct.

4.      Complainant stated that on February 14, 2019, she contacted Employee Relations. Complainant stated that the whole team wanted to meet with Employee Relations. Complainant stated that Henderson Banks, Employee Relations, reached out to them. Complainant stated that Banks wanted phone communication with each person but the team wanted a face-to-face meeting. Complainant stated that Kerry was going on vacation and she provided a letter to Banks if they met with him in person while he was on vacation. Complainant stated that Banks gave her the runaround about meeting in person. Complainant stated that Employee Relations reached out to Stephanie Bristow and Stephanie Peters and that is when the retaliation got worse. **Group Exhibit M** is e-mail correspondence between Complainant, Henderson Banks and Melissa Thomas. The e-mail correspondence is dated February 20, 2019 and February 25, 2019. On February 20, 2019, Complainant e-mailed Henderson Banks, Employee Relations Specialist, and she stated, "This is a perfect example of retaliation. Yesterday, I had an eye doctor appointment and had to leave early at 12:30 p.m. Stephanie told Melissa and Juanita not to take any of these to the Post Office, I will have Lynn to take it to the Post Office." Complainant informed Banks that Bristow pulled out work related mails to the post office and left all the personal mail tubs for her to take to the post office. Complainant stated, "It's obviously retaliation for me leaving early." Complainant asked Banks if there would be a meeting with Amanda Quinton because Quinton wanted to have a one-on-one meeting with her about her written warning. Banks responded and informed Complainant that she should go to the meeting with Quinton. On February 25, 2019, Banks informed Complainant that "we came up with a plan of action to resolve these concerns moving forward."

5.      Complainant stated that she had an eye doctor appointment and she had to leave early on February 14, 2019. Complainant stated that Stephanie Bristow told her team members to leave all of her work and she piled it up for her to take to the post office when she came back in the morning and she took only few of the mail pieces to the post office.

6.      Complainant stated that Stephanie Bristow would purposely set up one-on-one meetings at 3:30 p.m., knowing that she had tons of FedEx to process before they come at 4:00 p.m. Complainant stated that Bristow would set up supply orders, each team member would have two buildings and Bristow gave her four buildings so that she would have more work.

Charge No.: 2019CF2842
Page 26 of 41

7.   Complainant stated that on February 18, 2019, Stephanie Bristow assigned her to do the back room, clean up the mess and do inventory.  Complainant stated that the back room was dirty and dusty and she told Bristow that she had FedEx to do.  Complainant stated that Bristow told her to do the inventory and clean up.

8.   Complainant stated that on February 28, 2019, 108 Building water cases order came and Stephanie Bristow ordered her to manually transport the water cases on her own. Complainant stated that Bristow wanted her to go to the 200 Building, take apart the water cases from the skid, load on the cart and load up in the van.  Complainant stated that she told Bristow that it was a lot and she had FedEx to do and Bristow told her that she could do it by herself.  Complainant stated that she went to the van.  Complainant stated that she saw Melissa and she told her about the water cases assignment and Melissa said that was a three-man job.  Melissa went to ask Bristow if she could help her and Bristow said no. Complainant stated that she left the 200 Building and she loaded about 15 cases by herself and she still had more to go as there was a total of 84 cases.  Complainant stated that she went to 108 Building and she told Sam Witanan for Soxedo and Witanan said that she could not do this by herself.  Complainant stated that Witanan called Joe Perryman to come down to help her.  Complainant stated that she and Perryman unloaded the water cases and then Perryman and she went back to the 200 Building to load up again.  Complainant stated that it took five trips and Perryman took it all up to the 4th floor.  Complainant stated that she went back to the 300 Building after she was done and she asked Bristow why she would not let Melissa help her with the cases.

9.   Complainant stated that she was so upset because it was too much work for one person and there was no reason to hurt her like that.  Complainant stated that she felt humiliated and she cried.  Complainant stated that Bristow walked around with a smirk on her face and she told her, "You better do FedEx now."  Complainant stated that she was terribly upset and she texted Stephanie Peters and Amanda Quinton and they both came.  Complainant stated that she told Peters and Quinton what Bristow did to her and she told Quinton that Bristow has been harassing her for months.  Complainant stated that she told Quinton, "I better not get fired for this."  Complainant stated that Quinton said, "Oh no, you won't be fired.  I promise you that."  **Group Exhibit M** is e-mail correspondence from Complainant to Stephanie Peters and Stephanie Bristow.  The date of the e-mail correspondence is February 28, 2019.  Complainant e-mailed Stephanie Peters and cc'd Stephanie Bristow and stated, "I got upset with Bristow because she made me to do the water cases by myself. That's 80 cases.  I asked Bristow if I can have Melissa help me and she said no.  I can't believe this is unethical.  It should be 2 person job, not one person's job.  This is not fair at all.  Then, she wants me to leave without pay.  I want my full day's pay because I just got back from unloading the water case pallet.  I needed a break."  This e-mail was sent at 3:59 p.m. on February 28, 2019.  At 4:01 p.m. Complainant e-mailed Peters and stated, "You need to tell Stephanie Bristow not be too rough with me, expecting a lot out of me.  To do the water cases by myself.  She expected me to do it all by myself.  That's crazy.  It's not right to force someone to do a job like that by one person self."

Charge No.: 2019CF2842
Page 27 of 41

10.   Complainant stated that Melissa Thomas received a written warning for misconduct in December 2018, for being loud trying to get her attention across the mailroom. Complainant stated that Juanita Barrera also got a written warning for not finishing her jobs. Complainant stated that Kerry Martin got written up for not cleaning up after his job was complete. Complainant stated that Martin left a mess on the counter. Complainant stated that Melissa Thomas also received a written warning on February 13, 2019.

**B.    Respondent's Evidence:**

1.    See Respondent's Evidence for Counts A-F.

2.    Stephanie Bristow (did not engage in a protected activity) Manager, Corporate Campus Buildings & Operations, stated that she had no knowledge that on February 11, 2019, Complainant and her team members reported that she took mail home.

3.    Frank Bear (did not engage in a protected activity) In-house Counsel, stated that on February 11, 2019, Complainant initiated an internal complaint against Stephanie Bristow, wherein she included her mailroom coworkers, including Ms. Thomas, and alleged that Bristow was creating a toxic work environment based on age. Bear stated that Complainant did not indicate that her disability was a basis for the toxic work environment. Bear stated that Complainant alleged that Bristow, who was in her 30s, was overworking her, and others in her department, who were in their 50s. Bear stated that on February 14, 2019, Complainant alleged harassment but pointed to the job duties that Bristow directed her and her co-workers to do. Bear stated that after a Human Resources investigation, Complainant's allegations were deemed unfounded, because Complainant's allegations of harassment and/or a toxic work environment did not indicate that she or her co-workers were subjected to unlawful harassment. Bear stated that Complainant did not indicate that any negative comments were made about her disability.

**C.    Complainant's Rebuttal:**

**Analysis:**

The investigation revealed that Complainant did not receive a written warning on February 13, 2019, in retaliation for engaging in a protected activity. The investigation revealed that Complainant contends that on February 11, 2019, she and her co-workers reported that Stephanie Bristow (did not engage in a protected activity) took Respondent's mail home, which is a violation of Respondent's policy. The investigation revealed that Bristow denied knowledge of being reported by Complainant or any other team member on February 11, 2019. The evidence reveals that in January 2019, Complainant received a verbal warning after a United Parcel Service (UPS) Driver filed a complaint against her. The evidence reveals that on February 13, 2019, Complainant received a written warning for misconduct. The investigation revealed that Complainant conceded that all four of the employees in Mail Services received a written warning on February 13, 2019. The evidence reveals that Martin and Thomas received a final written warning on February 13, 2019. The investigation revealed that there is no evidence that Juanita Barrera, SOSPM, received a written warning on February 13, 2019.

Charge No.: 2019CF2842
Page 28 of 41

## Findings & Conclusion-Count G:

A finding of **Lack of Substantial Evidence** is recommended because:

The evidence reveals that in January 2019, Complainant received a verbal warning after a United Parcel Services (UPS) Driver complained about her conduct. The investigation revealed that Complainant contends that she and her team members reported to Respondent's Compliance Office that Stephanie Bristow (did not engage in a protected activity) Manager, took Respondent's mail home, which is a violation of Respondent's policy. The investigation revealed that Complainant contends that Bristow issued her a written warning on February 13, 2019, in retaliation for reporting Bristow to Respondent's Compliance Office. The investigation revealed that Bristow denied knowledge that Complainant and/or any of the Mail Service employees reported her to the Compliance Office on February 11, 2019. The evidence reveals that on February 13, 2019, Bristow issued Complainant a written warning for misconduct. The evidence reveals that it is uncontested that Kieran (Kerry) Martin and Melissa Thomas also received a written warning on February 13, 2019. The investigation revealed that there is no evidence to indicate that Juanita Barrera received a written warning on February 13, 2019. The investigation revealed that there is no evidence to indicate that Martin took part in the report to the Compliance Office.

The investigation revealed that even though Stephanie Bristow denied knowledge of any report that may have been made to the Compliance Office on February 11, 2019, there is no evidence to indicate that Complainant engaged in a protected activity, as reporting a violation of Respondent's policy regarding taking mail home is not a protected activity.

There is no evidence of a retaliatory motivation by Respondent. There is no evidence that Complainant engaged in a protected activity. There is not substantial evidence that Complainant was issued a written warning on February 13, 2019, in retaliation for engaging in a protected activity on February 11, 2019.

## Complainant's Allegations-Count H:

Complainant alleges that her work hours were changed in January 2019, in retaliation for engaging in a protected activity. Complainant alleges that she was hired by Respondent on December 15, 2003. Complainant alleges that her work performance as Mailroom Clerk met Respondent's expectations. Complainant alleges that in November 2018 and in January 2019, she complained about Stephanie Bristow's, Manager, conduct towards her. Complainant alleges that on January 11, 2019, Bristow abruptly changed her work hours and no reason was given for the change in her hours. Complainant alleges that Respondent's adverse action occurred within such a short period of time after her complaints about Bristow that it raises an inference of retaliatory motivation.

## Respondent's Defense-Count H:

Respondent's articulated, non-discriminatory defense is that all of the Specialist, Office Support, Print & Mailroom (SOSPMs) had their work hours adjusted in January 2019, strictly to meet Respondent's business needs.

Charge No.: 2019CF2842
Page 29 of 41

**Investigation Summary-Count H:**

**A.    Complainant's Evidence:**

1.    See Complainant's Evidence for Counts A-G.

2.    Complainant stated that on January 11, 2019, Stephanie Bristow decided to change their hours. Complainant stated that Bristow knew how far she lived from work and she knew that she had these hours for many years because she lives far and I-294 always has construction. Complainant stated that her original hours were 7:00 a.m. to 3:30 p.m. Complainant stated that Bristow changed her hours to 8:00 a.m. to 4:30 p.m. Complainant stated that Bristow stated that she wanted her to stay late to finish FedEx. Complainant stated that there was no valid reason for changing her hours. Complainant stated that her work hours had not changed for ten of her 15 years of employment with Respondent.

3.    Complainant stated that Bristow changed her hours in retaliation for complaining about her. Complainant stated that she talked to Stephanie Peters about this a few times, on January 11, 2019; January 14, 2019 and on January 15, 2019[4].

4.    Complainant stated that on January 14, 2019, Stephanie Bristow gave her a smirk smile because of her new work hours and she said, "You will have to stay longer now. Finish FedEx." Complainant stated that there was no reason to change her hours and this was retaliation for her talking to Stephanie Peters about Bristow's behavior towards her.

5.    Complainant stated that her other co-workers' hours changed by a half-hour difference whereas her hours were changed with a one-hour difference.

**B.    Respondent's Evidence:**

1.    See Respondent's Evidence for Counts A-G.

2.    Stephanie Bristow (did not engage in a protected activity) stated that she had no knowledge that Complainant talked to Stephanie Peters, Director, about her or about anything else.

3.    Bristow stated that all of the four SOSPMs had their work hours changed. Bristow stated that the work hours were changed due to business need. Bristow stated that mail was not being delivered and the work was not being completed.

4.    Bristow stated that from January 1, 2017 through approximately January 14, 2019, Complainant's work hours were from 7:00 a.m. to 3:30 p.m., Monday through Friday. Bristow stated that on or about January 15, 2019, Complainant's schedule was adjusted to 8:00 a.m. to 4:30 p.m. Bristow stated that in order to give Complainant the opportunity to

---

[4] During the course of the investigation, Complainant maintained that she spoke to Stephanie Peters about Stephanie Bristow's behavior towards her as she identified in Counts A-C regarding the harassment. Complainant reported that she and her co-workers were overworked and they were expected to complete job duties that were meant for more than one person.

Charge No.: 2019CF2842
Page 30 of 41

ease into her schedule change to 8:00 a.m., she allowed Complainant to continue to work from 7:00 a.m. to 3:30 p.m. until February 4, 2019.

5.    Bristow stated that Complainant did not always arrive at work at 7:00 a.m. and she did not always leave at 3:30 p.m. Bristow stated that she changed Complainant's hours to 8:00 a.m. to 4:30 p.m. to ensure that the mail was delivered and the work got completed. Bristow stated that Complainant's new hours did not start until February 2019. **Group Exhibit Z** is Complainant's timecard for the time period of January 1, 2017 to March 4, 2019. The timecard indicates that Complainant did not consistently arrive to work at 7:00 a.m. and she did not consistently leave at 3:30 p.m. The last page of the timecard seems to indicate that Complainant's new hours began on February 14, 2019.

**C.    Complainant's Rebuttal:**

1.    Complainant did not provide any further information other than what was presented in Complainant's Evidence Section for Counts A-H.

**Analysis:**

The investigation revealed that Complainant worked for Respondent since December 15, 2003. It is uncontested that Stephanie Bristow became Complainant's direct supervisor in November 2018. The investigation revealed that Complainant contends that her work hours were changed from 7:00 a.m. to 3:30 p.m. to 8:00 a.m. to 4:30 p.m. on January 11, 2019. The investigation revealed that Complainant contends that her work hours were changed by Stephanie Bristow (did not engage in a protected activity) Manager, in retaliation for reporting Bristow's behavior towards her to Stephanie Peters, Director. The investigation revealed that Complainant reported that Bristow changed her work hours and that her managerial style was overbearing and intimidating and that she expected the SOSPMs to do the work of two or more people. It is uncontested that due to a reduction in force, the employees in Mail Services decreased from 14 to four in 2018. The investigation revealed that Complainant conceded that Kieran (Kerry) Martin, Melissa Thomas and Juanita Barrera, SOSPMs, all had their work hours altered.

The investigation revealed that Stephanie Bristow contends that Complainant's work hours were changed due to Respondent's business needs and to ensure that mail was delivered and work was completed. The evidence reveals that Complainant's timecard record for the time period of January 1, 2017 to March 4, 2019, indicates that Complainant did not always arrive at work on a consistent basis at 7:00 a.m. and she did not leave at 3:30 p.m. on a consistent basis. The evidence appears to indicate that Complainant's new hours did not go into effect until February 14, 2019.

**Findings & Conclusion-Count H:**

A finding of **Lack of Substantial Evidence** is recommended because:

The investigation revealed that Complainant did not engage in a protected activity. The investigation revealed that Complainant contends that she spoke to Stephanie Peters, Director, about Stephanie Bristow's behavior in that Bristow's managerial style was intimidating and

Charge No.: 2019CF2842
Page 31 of 41

confrontational and that she expected the SOSPMs in Mail Service to do the work of two or more workers. It is uncontested that in 2018, the employees in Mail Service were reduced from 14 to four. The investigation revealed that Complainant contends that Bristow changed her work hours from 7:00 a.m. to 3:30 p.m. on January 11, 2019. The investigation revealed that Complainant conceded that Bristow also changed the work hours for Melissa Thomas, Kieran (Kerry) Martin and Juanita Barrera, but their hours were changed by 30 minutes and her work hours changed by one hour. The investigation revealed that Bristow contends that all the employees work hours were changed to ensure that mail was delivered and work got completed. The evidence reveals that between January 1, 2017 and March 4, 2019, Complainant did not arrive at work at 7:00 a.m. on a consistent basis and she did not leave work at 3:30 p.m. on a consistent basis. The investigation revealed that Bristow allowed Complainant to begin her new hours in February 2019. The investigation revealed that Bristow denied knowledge of any discussions between Complainant and Stephanie Peters, Director.

There does not appear to be a retaliatory motivation by Respondent. There is no evidence that Complainant engaged in a protected activity in November 2018 and/or in January 2019. There is not substantial evidence that Complainant's work hours were changed on January 11, 2019, in retaliation for engaging in a protected activity.

## Complainant's Allegations-Counts I & J:

Complainant alleges that her work hours were changed in January 2019, because of her disability, deafness (Count I) and her sex, female (Count J). Complainant alleges that she was hired by Respondent on December 15, 2003. Complainant alleges that her work performance as Mailroom Clerk met Respondent's expectations. Complainant alleges that on January 11, 2019, Bristow abruptly changed her work hours and no reason was given for the change in her hours. Complainant alleges that similarly situated non-disabled employees and/or male employees did not have their work hours changed.

## Respondent's Defense-Counts I & J:

Respondent's articulated, non-discriminatory defense is that all of the Specialist, Office Support, Print & Mailroom (SOSPMs) had their work hours adjusted in January 2019, strictly to meet Respondent's business needs.

## Investigation Summary-Counts I & J:

A. **Complainant's Evidence:**

1. See Complainant's Evidence for Counts A-H.

B. **Respondent's Evidence:**

1. See Respondent's Evidence for Counts A-H.

Charge No.: 2019CF2842
Page 32 of 41

**C.    Complainant's Rebuttal:**

1.    Complainant did not provide any further information other than what was presented in Complainant's Evidence Section for Counts A-H.

**Analysis:**

The investigation revealed that Complainant worked for Respondent since December 15, 2003. It is uncontested that Stephanie Bristow (disabled, female) Manager, became Complainant's direct supervisor in November 2018. The investigation revealed that Complainant contends that Bristow changed her work hours. The investigation revealed that Complainant contends that her work hours changed from 7:00 a.m. to 3:30 p.m. to 8:00 a.m. to 4:30 p.m. on January 11, 2019, due to her disability, deafness and her sex. The investigation revealed that Complainant conceded that Kieran (Kerry) Martin (non-disabled, male), Melissa Thomas (non-disabled, female) and Juanita Barrera (non-disabled, female) SOSPMs, all had their work hours altered.

The investigation revealed that Stephanie Bristow contends that Complainant's work hours were changed due to Respondent's business needs and to ensure that mail was delivered and work was completed.    The evidence reveals that Complainant's timecard record for the time period of January 1, 2017 to March 4, 2019, indicates that Complainant did not always arrive at work on a consistent basis at 7:00 a.m. and she did not leave at 3:30 p.m. on a consistent basis. The evidence appears to indicate that Complainant's new hours did not go into effect until February 14, 2019.

**Findings & Conclusion-Counts I & J:**

A finding of **Lack of Substantial Evidence** is recommended because:

The evidence reveals that Complainant is a disabled individual as defined within the meaning of the Illinois Human Rights Act. The investigation revealed that it is uncontested that Complainant worked for Respondent since December 15, 2003. The investigation revealed that Respondent was aware of Complainant's disability. The investigation revealed that Complainant contends that Stephanie Bristow (disabled, female) changed her work hours from 7:00 a.m. to 3:30 p.m. to 8:00 a.m. to 4:30 p.m. on January 11, 2019.   The investigation revealed that Complainant conceded that Bristow also changed the work hours for Melissa Thomas (non-disabled, female), Kieran (Kerry) Martin (non-disabled, male) and Juanita Barrera (non-disabled, female) SOSPMs, but their hours were changed by 30 minutes and her work hours changed by one hour. The investigation revealed that Bristow contends that all the employees work hours were changed to meet Respondent's business needs and to ensure that mail was delivered and work got completed. The evidence reveals that between January 1, 2017 and March 4, 2019, Complainant did not arrive at work at 7:00 a.m. on a consistent basis and she did not leave work at 3:30 p.m. on a consistent basis. The investigation revealed that Bristow allowed Complainant to begin her new hours in February 2019.

There is no evidence of an animus based on disability status and/or sex. There is not substantial evidence that Complainant's work hours were changed on January 11, 2019, due to her disability, deafness and/or her sex, female.

Charge No.: 2019CF2842
Page 33 of 41

**Complainant's Allegations-Counts K & L:**

Complainant alleges that she was discharged on March 4, 2019, because of her disability, deafness (Count K) and her sex, female (Count L). Complainant alleges that she was hired by Respondent on December 15, 2003. Complainant alleges that her work performance as Mailroom Clerk met Respondent's expectations. Complainant alleges that on March 4, 2019, she was discharged by Stephanie Peters (no known disability, female) Director. Complainant alleges that the reason given for her discharge was misconduct. Complainant alleges that similarly situated non-disabled employees and/or male employees were not discharged for the same or similar reason.

**Respondent's Defense-Counts K & L:**

Respondent's articulated, non-discriminatory defense is that Complainant was discharged on March 4, 2019 for displaying defiant behavior and unprofessional conduct.

**Investigation Summary-Counts K & L:**

**A.**    **Complainant's Evidence:**

1.    See Complainant's Evidence for Counts A & B and D-F.

2.    Complainant stated that she was discharged on March 4, 2019. Complainant stated that Stephanie Bristow approached her at work and stated that Stephanie Peters, Director, Guest and Team Member Services, wanted to see her. Complainant stated that she met with Peters in a small conference room and Luci Brooks (no known disability, female) Human Resources was also present. Complainant stated that Peters said through an interpreter who was also present, that "we decided to let you go, due to being disruptive. Luci here, will help you to get your paid time offs (PTOs) and profit sharing information. Complainant stated that Peters told her that she was disruptive and gave no other explanation.

3.    Complainant stated that she was not given a termination letter or document.

4.    Complainant stated that her co-workers, Kieran Martin (no known disability, male) quit Respondent voluntarily right before she was discharged. Complainant stated that Melissa Thomas (no known disability, female) and Juanita Barrera (no known disability, female) were discharged shortly after she was discharged.

5.    Complainant stated that she does not know if she was replaced.

**B.**    **Respondent's Evidence:**

1.    See Respondent's Evidence for Counts A & B and D-F.

2.    Stephanie Bristow (disabled, female) Manager, Corporate Campus Building & Operations, stated that on February 28, 2019, she directed Complainant to relocate water from the dock

Charge No.: 2019CF2842
Page 34 of 41

to Building 108, Respondent's Executive Building, and Complainant refused and stated that it was too much work.

3.     Bristow stated that she told Complainant that the task had to be done and when Complainant returned to the mailroom, she was upset and began yelling at her. Bristow stated that she could not calm Complainant down. Bristow stated that she had to call Stephanie Peters, Director, and Amanda Quinton, Senior Director, who came to the mailroom to help calm Complainant down. Bristow stated that Complainant did not comply with multiple requests to stop yelling and she was eventually sent home.

4.     Bristow stated that she was not involved in the decision to discharge Complainant. Bristow stated that Stephanie Peters, Director, and Amanda Quinton, Senior Director, consulted with Human Resources and it is her understanding that all parties agreed to move forward with Complainant's discharge.

5.     Bristow stated that on March 4, 2019, she did tell Complainant that Stephanie Peters wanted to meet with her but she was not part of the meeting.

6.     Bristow stated that Complainant's disability and/or sex had nothing to do with her discharge. Bristow stated that Complainant was discharged for displaying defiant conduct and unprofessional behavior. **Exhibit W** is a letter to Complainant from Stephanie Peters, Director, Guest & Team Member Services. The letter is dated March 5, 2019. The letter indicates that on March 4, 2019, Peters, Complainant and Luci Brooks, Human Resources Business Partner met in person to notify Complainant that she was discharged for violations of company policy on January 10, 2019; February 7, 2019; February 11, 2019; and, on February 28, 2019.

7.     Bristow stated that Complainant was not replaced.

8.     Attorney Frank Bear (non-disabled, male) In-house Counsel, stated that other employees have been discharged in the past two years. Bear stated that Respondent does not track the disability status of its employees. **Exhibit V** is a list of employees who were terminated between October 1, 2018 and July 31, 2019. The list provides the names of nine employees, excluding Complainant. The list indicates that none of the nine employees had a known disability and none of the nine filed an internal or external complaint. The list indicates that all of the employees worked in the Mailroom and three of the employees held the position of Clerk Jr.; three held the position of Clerk Sr.; and, three held the position of Specialist Office Support Print & Mailroom (SOSPM). The list indicates that five were involuntarily discharged due to a reduction in force; Kieran Martin voluntarily separated due to personal reasons; one quit for another job; Juanita Barrera was discharged for unsatisfactory performance; and, Melissa Thomas was discharged for misconduct.

Staff Note:
On October 1, 2020, staff requested that Respondent provide the name and disability status of any similarly situated employee who was discharged between March 4, 2017 and March 3, 2019 and provide the date of the discharge, the reason for the discharge, the discharge document, the name

Charge No.: 2019CF2842
Page 35 of 41

of the person who made the decision to discharge the employee; the disability status and the title/position of the decision-maker; and, indicate whether the employee who was discharged filed an internal and/or external complaint of discrimination, harassment, sexual harassment and/or retaliation within six months preceding the discharge. On October 9, 2020, Respondent responded to staff's request and provided the list of employees who were discharged between October 1, 2018 and July 31, 2019. Respondent did not provide the discharge document for the employees.

On October 27, 2020, staff sent an e-mail to Attorney Frank Bear, In-house Counsel for Respondent and requested a copy of the discharge document for the nine employees identified in the list of employees who were discharged. On October 29, 2020, Respondent responded to staff's request and reported that Respondent does not provide employees with a discharge document and that Complainant was provided with a termination letter in writing due to her deafness.

9.    Bear stated that Complainant was not a union employee.

10.   Bear stated that Respondent does maintain a disciplinary policy. **Group Exhibit X** is Respondent's Discipline Policy. Section 4.1 addresses the Core Principles of the policy and the third paragraph states, "The Discipline Policy is not a contract of employment between Walgreens and any Team Member, it does not alter the nature of at-will employment, and it does not entitle Team Members to Progressive Disciplinary action in any particular case."

11.   Bear stated that Respondent also maintains a standards of conduct policy. **Group Exhibit Y** is Respondent's Standards of Conduct Policy. The policy provides a list of examples of conduct for which an employee may be subject to disciplinary action, up to and including immediate termination.

## C.    **Complainant's Rebuttal:**

1.    Complainant did not provide any additional information other than what was presented in Complainant's Evidence Section for Counts A-H.

## **Analysis:**

The investigation revealed that Complainant contends that she was discharged on March 4, 2019, because of her disability, deafness and her sex, female. The investigation revealed that Complainant contends that on March 4, 2019, Stephanie Peters (no known disability, female) Director, discharged her and informed her that Respondent decided to let her go for being disruptive. The investigation revealed that on February 28, 2019, Stephanie Bristow (disabled, female) Manager, assigned Complainant to relocate water from the dock to an Executive Building and Complainant refused and said that it was too much work. The investigation revealed that Complainant contends that the job duty was too much for her and Bristow would not allow anyone to help her. The investigation revealed that Complainant contends that when she returned to the mailroom, she was upset and frustrated. The investigation revealed that Complainant contends that she sent a text message to Peters and Amanda Quinton, Senior Director and they came to the mailroom. The investigation revealed that Bristow contends that Complainant was yelling and

Charge No.: 2019CF2842
Page 36 of 41

very upset and she could not calm her down. The evidence reveals that Complainant sent an e-mail to Peters and told her that she needed to tell Bristow to not be so rough with her and that the job was too much for one employee to do.

The investigation revealed that Stephanie Bristow contends that she had no input into the decision to discharge Complainant. The investigation revealed that Stephanie Peters and Amanda Quinton consulted with Human Resources and it was decided to discharge Complainant for defiant behavior and unprofessional conduct. The investigation revealed that between October 1, 2018 and July 31, 2019, nine employees were terminated, excluding Complainant. The investigation revealed that seven of the nine were involuntarily discharged and none of the nine employees had a known disability and six were male. The investigation revealed that all nine employees worked in the Mail Room, including Kieran (Kerry) Martin, Melissa Thomas and Juanita Barrera and Martin voluntarily resigned for "personal reasons."

**Findings & Conclusion-Counts K & L:**

A finding of **Lack of Substantial Evidence** is recommended because:

The investigation revealed that Complainant began working for Respondent on December 15, 2003. The evidence reveals that Complainant is a disabled individual as defined within the meaning of the Illinois Human Rights Act. The investigation revealed that it is uncontested that Respondent was aware of Complainant's disability. The investigation revealed that it is uncontested that Stephanie Bristow (disabled, female) became the Manager and the direct Supervisor for the employees in the Mail Room, including Complainant, Kieran (Kerry) Martin (non-disabled, male), Melissa Thomas (non-disabled, female) and Juanita Barrera (non-disabled, female). The investigation revealed that on February 28, 2019, Bristow assigned Complainant to transport water to one of Respondent's Buildings and when Complainant asked for help, Bristow said no. The investigation revealed that when Complainant returned to the mail room, she was highly upset and frustrated. The investigation revealed that Bristow contends that she could not calm Complainant down and she called Stephanie Peters (no known disability, female) Director and Amanda Quinton (no known disability, female) Senior Director, to come to the mail room to help calm Complainant down. The investigation revealed that Complainant contends that she asked that Peters and Quinton come to the mail room. The evidence reveals that she later e-mailed Peters and stated, "You need to tell Stephanie Bristow not to be so rough with me." The investigation revealed that Bristow contends that she was not the decision-maker and that Peters, Quinton and Human Resources made the decision to discharge Complainant for defiant behavior and unprofessional conduct on March 4, 2019.

The investigation revealed that between October 1, 2018 and July 31, 2019, nine employees were terminated, excluding Complainant. The investigation revealed that seven of the nine were involuntarily terminated and none of the nine employees had a known disability and six here male. The investigation revealed that all nine employees worked in the Mail Room, including Kieran (Kerry) Martin, Melissa Thomas and Juanita Barrera.

Charge No.: 2019CF2842
Page 37 of 41

There is no evidence of an animus based on disability and/or sex. There is not substantial evidence that Complainant was discharged on March 4, 2019, because of her disability, deafness and/or her sex, female.

**Complainant's Allegations-Count M:**

Complainant alleges that she was discharged on March 4, 2019, in retaliation for engaging in a protected activity. Complainant alleges that she was hired by Respondent on December 15, 2003. Complainant alleges that her work performance as Mailroom Clerk met Respondent's expectations. Complainant alleges that in November 2018 and in January 2019, she complained about Stephanie Bristow's, Manager, conduct towards her. Complainant alleges that on March 4, 2019, she was discharged by Stephanie Peters, Director. Complainant alleges that the reason given for her discharge was misconduct. Complainant alleges that Respondent's adverse action occurred within such a short period of time after her complaints about Bristow that it raises an inference of retaliatory motivation.

**Respondent's Defense-Count M:**

Respondent's articulated, non-discriminatory defense is that Complainant was discharged on March 4, 2019, for displaying defiant behavior and unprofessional conduct and she did not engage in a protected activity during her employment.

**Investigation Summary-Count M:**

A.     **Complainant's Evidence:**

1.     See Complainant's Evidence for Counts C, G & H and K & L.

2.     Complainant stated that she believes that she was terminated in retaliation for reporting Stephanie Bristow's violation of mail room practices. Complainant stated that Bristow created a hostile and toxic workplace in order to make her and her team miserable. Complainant stated that it was well known that Respondent's management, Stephanie Peters, put Bristow in to remove them to subsidize the costs of an employee. Complainant stated that she worked for Respondent for 15 years under both Linda Balsamo and Mike Copeland. Complainant stated that she never had any issues while working under Balsamo and Copeland.

3.     Complainant stated that Respondent does maintain a disciplinary policy but she does not have a copy of the policy.

4.     Complainant stated that she received a verbal warning related to a complaint from a United Parcel Service (UPS) Driver. Complainant stated that Stephanie Bristow asked her about the alleged complaint from the UPS Driver. Complainant stated that she told Bristow her reasons for her action with the UPS Driver and she said that she understood. Complainant stated that Bristow told her that it would not go on her record and it would be removed.

Charge No.: 2019CF2842
Page 38 of 41

5. Complainant stated that the incident with the United Parcel Driver (UPS) Driver occurred on January 10, 2019. Complainant stated that the UPS Driver was not very nice to her and he was upset that he could not unload all the packages at the 300 Building from the top of the ramp to the dock door as it has a very steep ramp. Complainant stated that the 300 Building Dock doors were being repaired. Complainant stated that the UPS Driver came to her building to try to drop off the load with her. Complainant stated that she asked him to be patient. Complainant stated that she informed the driver that she had no room for her packages that arrived from other UPS/FedEx drivers. Complainant stated that the UPS Driver became impatient and she told him to just leave the packages outside on the dock and she would take care of it. Complainant stated that the driver complained to Stephanie Bristow about it because he ended up leaving the packages outside on the dock.

6. Complainant stated that Juanita Barrera got fired five months after her and Melissa Thomas got fired one month after her and they were all involved in reporting Stephanie Bristow for taking Respondent's mail home.

**B.    Respondent's Evidence:**

1. See Respondent's Evidence for Counts A-H and K & L.

**C.    Complainant's Rebuttal:**

1. Complainant did not provide any additional information other than what was previously presented in Complainant's Evidence Sections for Counts A-H and K-M.

**Analysis:**

The investigation revealed that Complainant contends that she was discharged on March 4, 2019, in retaliation for engaging in a protected activity. The investigation revealed that Complainant contends that she spoke to Stephanie Peters, Director, in November 2018, January 2019 and on February 28, 2019, about Stephanie Bristow's managerial style and on February 11, 2019, she reported Bristow for violating Respondent's policy for taking Respondent's mail home. The investigation revealed that the bulk of Complainant's complaints were regarding being overworked and Bristow's tendency to micro-manage her and the other Mail Services Employees.

The investigation revealed that Complainant contends that on March 4, 2019, Stephanie Peters, Director, discharged her and informed her that Respondent decided to let her go for being disruptive. The investigation revealed that on February 28, 2019, Stephanie Bristow (did not engage in a protected activity) Manager, assigned Complainant to relocate water from the dock to an Executive Building and Complainant refused and said that it was too much work. The investigation revealed that Complainant contends that the job duty was too much for her and Bristow would not allow anyone to help her. The investigation revealed that Complainant contends that when she returned to the mailroom, she was upset and frustrated. The investigation revealed that Complainant contends that she sent a text message to Stephanie Peters and Amanda Quinton, Senior Director and they came to the mailroom. The investigation revealed that Bristow contends that Complainant was yelling and very upset and she could not calm her down. The

Charge No.: 2019CF2842
Page 39 of 41

evidence reveals that Complainant sent an e-mail to Peters and told her that she needed to tell Bristow to not be so rough with her and that the job was too much for one employee to do.

The investigation revealed that Stephanie Bristow contends that she had no input into the decision to discharge Complainant. The investigation revealed that Stephanie Peters and Amanda Quinton consulted with Human Resources and it was decided to discharge Complainant for defiant behavior and unprofessional conduct. The investigation revealed that between October 1, 2018 and July 31, 2019, nine employees were terminated, excluding Complainant. The investigation revealed that seven of the nine were involuntarily discharged and none of the nine employees had filed an internal or external complaint. The investigation revealed that all nine employees worked in the Mail Room, including Kieran (Kerry) Martin, Melissa Thomas and Juanita Barrera and Martin voluntarily resigned for "personal reasons."

**Findings & Conclusion-Count M:**

A finding of **Lack of Substantial Evidence** is recommended because:

The investigation revealed that Complainant began working for Respondent on December 15, 2003. The investigation revealed that it is uncontested that Stephanie Bristow (did not engage in a protected activity) became the Manager and the direct Supervisor for the employees in the Mail Room, including Complainant, Kieran (Kerry) Martin, Melissa Thomas, and Juanita Barrera. The investigation revealed that Complainant and Martin complained about Bristow's managerial style but did not indicate that her behavior was discriminatory or that she subjected them to illegal harassment. The investigation revealed that Complainant contends that on February 11, 2019, she reported that Bristow violated Respondent's policy by taking Respondent's mail home.

The investigation revealed that on February 28, 2019, Bristow assigned Complainant to transport water to one of Respondent's Buildings and when Complainant asked for help, Bristow said no. The investigation revealed that when Complainant returned to the mail room, she was highly upset and frustrated. The investigation revealed that Bristow contends that she could not calm Complainant down and she called Stephanie Peters, Director and Amanda Quinton, Senior Director, to come to the mail room to help calm Complainant down. The investigation revealed that Complainant contends that she asked that Peters and Quinton come to the mail room. The evidence reveals that she later e-mailed Peters and stated, "You need to tell Stephanie Bristow not to be so rough with me." The investigation revealed that Bristow contends that she was not the decision-maker and that Peters, Quinton and Human Resources made the decision to discharge Complainant for defiant behavior and unprofessional conduct on March 4, 2019.

The investigation revealed that between October 1, 2018 and July 31, 2019, nine employees were terminated, excluding Complainant. The investigation revealed that seven of the nine were involuntarily terminated and none of the nine employees filed an internal or external complaint of discrimination, harassment, sexual harassment and/or retaliation. The investigation revealed that all nine employees worked in the Mail Room, including Kieran (Kerry) Martin, Melissa Thomas and Juanita Barrera.

Charge No.: 2019CF2842
Page 40 of 41

There does not appear to be a retaliatory motivation by Respondent. There is no evidence that Complainant engaged in a protected activity. There is not substantial evidence that Complainant was discharged on March 4, 2019, in retaliation for engaging in a protected activity.

**Witness List:**

A.    Complainant (FFC)
      c/o Attorney John Chitkowski
      Chitkowski Law Offices
      901 Warrenville Road, Suite 103
      Lisle, IL 60532
      630-824-4808
      E-mail address: jjc@chitkowskilaw.com

B.    Stephanie Bristow (phone interview) (disabled, female)
      Manager, Corporate Campus Buildings & Operations
      c/o Attorney Frank Bear
      Walgreen Co.
      104 Wilmot Road MS144W
      Deerfield, IL 60015
      847-315-8055
      E-mail address: frank.bear@walgreens.com

C.    Kieran Martin (phone interview) (non-disabled, male)
      Former Mailroom Clerk
      773-405-7019

D.    Melissa Thomas (phone interview) (non-disabled, female)
      Former Mailroom Clerk
      847-445-7593

E.    Juanita Barrera (attempted)
      Former Mailroom Clerk

Staff Note:
On October 27, 2020, staff attempted to interview Juanita Barrera who Complainant identified as a potential witness. Although Ms. Barrera answered the phone, she did not wish to participate in the investigation as a witness.

F.    Samantha Witanen (attempted)
      262-765-9628

Staff Note:
On October 27, 2020, staff attempted to interview Samantha Witanen who Complainant identified as a potential witness. The female who answered the phone informed staff that Ms. Witanen is no longer employed by Respondent.

Charge No.: 2019CF2842
Page 41 of 41

**Exhibits:**

A.    Respondent's 2018 EEO Report
B.    Verification of Disability Form for Complainant
C.    Respondent's Code of Conduct & Business Ethics
D.    Job description for Specialist, Office Support, Print & Mailroom (SOSPM)
E.    Performance Improvement Plan (PIP) for Melissa Thomas signed by Stephanie Bristow on February 27, 2019
F.    E-mail correspondence on November 13, 2018 and January 9, 2019, regarding a missing package
G.    E-mail correspondence on November 14, 2018 and November 15, 2018 between Stephanie Bristow, Stephanie Peters, Complainant and Kieran (Kerry) Martin
H.    E-mail correspondence on February 8, 2019 and February 28, 2019, between Complainant, Stephanie Bristow, Melissa Thomas, Juanita Barrera, Kieran (Kerry) Martin and Stephanie Peters
I.    E-mail from Kieran (Kerry) Martin to Alan Nielsen on March 18, 2019, and a letter to Employee Relations from Martin
J.    Written warnings issued to Complainant on February 13, 2019 and to Kieran (Kerry) Martin and a written warning to Melissa Thomas on December 20, 2018
K.    E-mail correspondence between Complainant, Collin Kapinos and Stephanie Bristow on February 6, 2019 and February 7, 2019
L.    E-mail correspondence dated February 14, 2019 between Complainant and Doris Pigott
M.    E-mail correspondence between Complainant and Henderson Banks on February 20, 2019 and February 25, 2019
N.    E-mail correspondence from Complainant to Stephanie Peters and Stephanie Bristow on February 28, 2019
O.    Respondent's Harassment and Discrimination Policy
P.    Respondent's Open Door Policy
Q.    Respondent's Rest and Meal Break Policy
R.    Respondent's American Disabilities Act Policy
S.    Respondent's Non-Retaliation Policy
T.    Respondent's Reasonable Accommodation Policy
U.    Written warning issued to Melissa Thomas on February 13, 2019
V.    List of individuals discharged in the mailroom between October 1, 2018 and July 31, 2019
W.    Letter to Complainant from Stephanie Peters dated March 5, 2019
X.    Respondent's Discipline Policy
Y.    Respondent's Standards of Conduct Policy
Z.    Complainant's Timecard for the time period of January 1, 2017 and March 4, 2019

EEOC Form 161 (11/2020)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

EXHIBIT
2

## DISMISSAL AND NOTICE OF RIGHTS

| To: | **Lynn Hayes**<br>**c/o John Chitkowski, Esq.**<br>**Chitkowski Law Offices**<br>**901 Warrenville Road, Suite 103**<br>**Lisle, IL  60532** | From: | **Chicago District Office**<br>**230 S. Dearborn**<br>**Suite 1866**<br>**Chicago, IL 60604** |

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) |

| EEOC Charge No. | EEOC Representative | Telephone No. |
| --- | --- | --- |
| **21B-2019-01821** | **Daniel Lim,**<br>**State & Local Coordinator** | **(312) 872-9669** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

|  | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
|  | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
|  | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
|  | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
|  | The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge. |
| X | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
|  | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Julianne Bowman*/jwa

**Julianne Bowman,**
**District Director**

7/28/2021

(Date Issued)

Enclosures(s)

cc:

**WALGREENS BOOTS ALLIANCE, INC.**
**c/o Frank Bear, Esq.**
**106 Wilmot Road, 4th Floor, MS 144W**
**Deerfield, IL 60015**

## INFORMATION ON WHERE TO FILE SUIT

You have been notified of your right to sue in Federal District Court. Suit is ordinarily filed in the District having jurisdiction of the county in which the employer, against whom you filed a Charge of Employment Discrimination, is located. The telephone number listed for each District is that of the Clerk of the Court.

| U.S. DISTRICT COURT Northern District of Illinois **Eastern Division at Chicago** 219 S. Dearborn Street, Room 250 Chicago, IL 60604 (312-435-5670) | | U.S. DISTRICT COURT Central District of Illinois **Urbana Division** 218 U.S. Courthouse, 201 S. Vine Street Urbana, IL 61802 (217-373-5830) | |
|---|---|---|---|
| **Counties** | | **Counties** | |
| Cook | Kendall | Champaign | Kankakee |
| DuPage | Lake | Coles | Macon |
| Grundy | LaSalle | Douglas | Moultrie |
| Kane | Will | Edgar | Platt |
| | | Ford | Vermillion |
| | | Iroquois | |
| U.S. DISTRICT COURT Northern District of Illinois **Western Division at Rockford** 211 S. Court Street Rockford, IL 61101 (815-987-4480) | | **Peoria Division** 305 U.S. Courthouse, 100 N.E. Monroe Street Peoria, IL 61602 (309-671-7117) | |
| **Counties** | | **Counties** | |
| Boone | McHenry | Fulton | Putnam |
| Carroll | Ogle | Livingston | Stark |
| DeKalb | Stephenson | Marshall | Tazewell |
| JoDaviess | Whiteside | McLean | Woodford |
| Lee | Winnebago | Peoria | |
| U.S. DISTRICT COURT **Southern District of Illinois** | | **Rock Island Division (Temporarily Relocated)** 131 E. 4th Street, Room 250 Davenport, IA 52801 (309-793-5878) | |
| 301 W. Main Street Benton, IL 62812 (618-439-7760) | 750 Missouri Avenue E. St. Louis, IL 62201 (618-482-9371) | | |
| **Counties** | | **Counties** | |
| Alexander | Johnson | Bureau | Mercer |
| Bond | Lawrence | Henderson | Rock Island |
| Calhoun | Madison | Henry | Schuyler |
| Clark | Marion | Knox | Warren |
| Clay | Massac | McDonough | |
| Clinton | Monroe | **Springfield Division** 151 U.S. Courthouse, 600 E. Monroe Street Springfield, IL 62701 (217-4922-4028) | |
| Crawford | Perry | | |
| Cumberland | Pope | | |
| Edwards | Pulaski | | |
| Effingham | Randolph | | |
| Fayette | Richland | **Counties** | |
| Franklin | St. Clair | Adams | Macoupin |
| Gallatin | Saline | Brown | Menard |
| Hamilton | Union | Cass | Montgomery |
| Hardin | Wabash | Christian | Morgan |
| Jackson | Washington | DeWitt | Pike |
| Jasper | Wayne | Greene | Shelby |
| Jefferson | White | Logan | |
| Jersey | Williamson | | |

## FILING SUIT IN COURT OF COMPETENT JURISDICTION

PRIVATE SUIT RIGHTS

The issuance of this **Notice of Right to Sue** or **Dismissal and Notice of Rights** ends the EEOC process with respect to your Charge. You may file a lawsuit against the Respondent within 90 days from the date you receive this Notice. Therefore, you should keep a record of the date. Once the 90-day period is over, your right to sue is lost. If you intend to consult an attorney, you should do so as soon as possible. Furthermore, in order to avoid any question that you did not act in a timely manner, if you intend to sue on your own behalf; your suit should be filed well in advance of the expiration of the 90-day period.

You may file your lawsuit in a court of competent jurisdiction. Filing this Notice is not sufficient. A court complaint must contain a short Statement of the Facts of your case which shows that you are entitled to relief. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the Respondent has its main office.

You may contact the EEOC if you have any questions about your rights, including advice on which court can hear your case, or if you need to inspect and copy information contained in the case file.

**IF THE FIRST THREE CHARACTERS OF YOUR <u>EEOC CHARGE NUMBER</u> ARE "21B" <u>AND</u> YOUR CHARGE WAS INVESTIGATED BY THE ILLINOIS DEPARTMENT OF HUMAN RIGHTS (IDHR), REQUEST FOR REVIEWING AND COPYING DOCUMENTS FROM YOUR FILE <u>MUST</u> BE DIRECTED TO IDHR.**

A lawsuit against a private employer is generally filed in the U.S. District Court.

A lawsuit under Title VII of the Civil Rights Act of 1964, as amended, against a State agency or a political subdivision of the State is also generally filed in the U.S. District Court.

However, a lawsuit under the Age Discrimination in Employment of the American with Disabilities Act, or, probably, the Equal Pay Act against at State instrumentality (an agency directly funded and controlled by the State) can only be filed in a State court.

A lawsuit under the Age Discrimination in Employment Act or the American with Disabilities Act or the Equal Pay Act against a political subdivision of a State, such as municipalities and counties, may be filed in the U.S. District Court.

For a list of the U.S. District Courts, please see the reverse side.

**ATTORNEY REPRESENTATION**

If you cannot afford an attorney, or have been unable to obtain an attorney to represent you, the court having jurisdiction in your case may assist you in obtaining a lawyer. If you plan to ask the court to help you obtain a lawyer, you must make this request of the court in the form and manner it requires. Your request to the court should be made well in advance of the 90-day period mentioned above. A request for representation does not relieve you of the obligation to file a lawsuit within the 90-day period.

**DESTRUCTION OF FILE**

If you file suit, your or your attorney should forward a copy of your court complaint to this office. Your file will then be preserved. Unless you have notified us that you have filed suit, your Charge file could be destroyed as early as six months after the date of the Notice of Right to Sue

**IF YOU FILE SUIT, YOU OR YOUR ATTORNEY SHOULD NOTIFY THIS OFFICE WHEN THE LAWSUIT IS RESOLVED.**

# Code of Conduct & Business Ethics

November 2017



Walgreens Boots Alliance



EXHIBIT

3

An internal message from Jim Skinner and Stefano Pessina    4

I.      Introduction    5

II.     Our Code and Your Responsibilities    6

a.      Key principles    7

b.      Publication and amendments    7

c.      We are all accountable    7

d.      Members of management have additional responsibilities    7

e.      Where we can seek help    7

f.      No retaliation    8

g.      Open door environment    9

h.      What happens if you violate our Code?    9

i.      Asking questions and raising concerns    9

III.    A Foundation of Trust for Our Customers    11

a.      We uphold our trustworthy reputation through product safety    13

b.      We provide quality, dependable services our customers can count on    13

c.      We market our products and services honestly    13

d.      We expect our suppliers to uphold our values    13

e.      We protect the private information and intellectual property of others    14

f.      We uphold the competition and antitrust laws that apply to our work    14

g.      We obtain competitive information fairly    15

h.      We work on government contracts and programs lawfully and ethically    15

i.      We maintain appropriate relationships with healthcare professionals    16

IV.     A Foundation of Trust for WBA and Our Fellow Employees    16

a.      We foster diversity and inclusion in our workplace    17

b.      We respect each other and do not tolerate harassment    17

c.      We strive to create a safe and healthy work environment    17

d.      We work to protect WBA's assets    17

e.      We safeguard each other's personal information    19

21

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com.

f.     We use our computer systems appropriately                                    21

g.     We permit responsible individual social networking and blogging              21

**V.    A Foundation of Trust for Our Investors**                                   **23**

a.     We keep honest, accurate financial books and records                         23

b.     We maintain records in compliance with the law and WBA policy                23

c.     We avoid conflict of interest situations                                     23

d.     We allow modest, occasional gifts and entertainment                         25

e.     We avoid conducting business with friends and relatives                     26

f.     We limit conflicting outside business employment                            26

g.     We restrict business opportunities for personal gain                        28

h.     We uphold insider trading laws                                              28

i.     We comply with anti-money laundering laws                                   29

**VI.   A Foundation of Trust for Our Communities**                                **31**

a.     We comply with healthcare laws                                              31

b.     We work to build sustainable supply chains                                  31

c.     We comply with international trade laws                                      31

d.     We comply with anti-corruption and bribery laws                             31

e.     We do our part to protect the environment                                   33

f.     We support our local communities                                            33

g.     We communicate with a single voice                                          34

**VII.  Asking Questions and Raising Concerns**                                     **35**

Appendix A – Confidential Reporting Telephone Lines and Website Addresses          36

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com.

3

# Living Our Values Everyday

By living the Walgreens Boots Alliance values of Trust, Care, Innovation, Partnership and Dedication, we create a culture in which people act as a team and work together toward common goals. Walgreens Boots Alliance's five core values are part of everything we do.



### Trust:

Respect, integrity and candor guide our actions to do the right thing



### Care:

Our people and customers inspire us to act with commitment and passion



### Innovation:

We cultivate an open and entrepreneurial mind-set in all that we do



### Partnership:

We work collaboratively with each other and our partners to win together



### Dedication:

We work with rigor, simplicity and agility to deliver exceptional results

Walgreen Boots Alliance's vision, purpose and values underpin our actions as individuals and teams right across the organization. Only by respecting others and living to these guiding principles can we hope to achieve outstanding business results.

# Internal message from
# Jim Skinner and Stefano Pessina

## Walgreens Boots Alliance Code of Conduct and Business Ethics

Dear Colleagues,

We are pleased to share with you our Code of Conduct and Business Ethics for Walgreens Boots Alliance, Inc. This important document sets out the ethics, principles and standards upon which WBA was created. It is expected that everyone across our Company will uphold and adhere to these principles and standards wherever and whenever we do business.

As our Company has grown to global scale through the combination of Walgreens and Alliance Boots, our renowned reputation as the world's first global pharmacy-led, health and wellbeing enterprise is something we must strive to further develop. The Code of Conduct and Business Ethics is designed to help us maintain and protect that reputation and the responsibility that comes with it.

Trust is one of our core values — whether it is from our customers, partners, shareholders, the communities we serve, or you as employees — and is also vital to our ongoing success as a Company. We earn and strengthen trust through our consistent commitment to uncompromising high standards of integrity and service. Together with our other core values, vision and purpose, trust is a crucial guiding principle across the entire organization and must be at the heart of our ways of working and of everything we do.

This document is essential as it sets out the standards with which we must comply for working and winning together successfully. Its effective implementation is not optional. Everyone within Walgreens Boots Alliance is accountable for complying with it, and this involves a personal pledge from all of us.

Each year, we will review the Code to keep up with new developments in policies, regulations and laws.

We expect all colleagues to embrace the Code, and to continue to work together with unwavering integrity to forge a truly global champion for health, wellbeing and beauty.

Thank you for your on-going commitment.

Best regards,

**Jim Skinner**
Executive Chairman

**Stefano Pessina**
Executive Vice Chairman and CEO



**Walgreens Boots Alliance**

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com.

5

# I. Introduction

Walgreens Boots Alliance, Inc. and its subsidiary companies' (collectively "WBA") core values are trust, care, innovation, partnership, and dedication. The principles of honesty and integrity, which underpin trust, must characterize every aspect of our business activity. Applied with openness, teamwork and professionalism, these principles must lie at the heart of everything we do. Integrity means doing what is right. By acting with integrity, we reflect positively on the core values and reputation of WBA and its brands. We all want to do what is right, for WBA and for ourselves.



The Code of Conduct and Business Ethics ("the Code") extends to all WBA officers and employees no matter where they are located in the world. A WBA employee is any employee of Walgreens Boots Alliance, Inc. or any of its subsidiary companies. The Code also extends to any officers and employees of a business or company in which Walgreens Boots Alliance, Inc. or any of its subsidiaries has a controlling interest. It also extends to other parties acting on behalf of Walgreens Boots Alliance, Inc. or any of its subsidiaries, such as consultants, agents, intermediaries or other representatives of WBA, including our Board of Directors.

The Code defines how you should conduct yourself as an employee or representative of WBA. The Code addresses your responsibilities to WBA, to each other, and to customers, suppliers, consumers, and governments. Each of us is responsible for complying with the principles outlined in our Code. We are all required to understand the Code and follow WBA policy, as well as the laws and regulations in every location where we do business.

The Code cannot provide answers to every question you may have or tell you what to do in every situation in which you may find yourself. It does not serve as a substitute for your individual responsibility for exercising good judgment and common sense. It is a resource to be used to help guide your actions and provides details on where to go for more information on a particular subject, to ask questions, or to report a problem.

Violating the Code, WBA policy or standards can have serious consequences for WBA and for each of us as individuals. Those who fail to comply with the Code put themselves, their co-workers, and WBA at risk. This is taken very seriously and may result in disciplinary action up to and including dismissal.

Working at WBA puts you in a position of trust and responsibility to uphold our core values and ethical standards when dealing with each other, customers, suppliers, shareholders, the environment, and our local communities.

> **The Code has been translated into other languages but, if discrepancies occur in the text, the English version will prevail. Businesses may adapt this Code for local use provided the revisions remain equally comprehensive and do not result in any inconsistency with or lessening of any of the principles, standards or obligations stated in this Code. An advance copy of any adaptations must be forwarded for approval to the Global Chief Compliance and Ethics Officer prior to implementation.**

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com.

Case: 1:21-cv-05663 Document #: 10 Filed: 01/03/22 Page 74 of 106 PageID #:184

Each of us is responsible for complying with the principles outlined in our Code. We are all expected to be familiar with and comply with WBA policies, as well as the laws and regulations in every location where we do business and in which you work. By regularly reviewing and understanding our Code and policies, we become better prepared to handle ethical issues as they arise.

### a. Key principles

Each of us is responsible for:



- Integrity and compliance – Achieving our goals with integrity and in compliance with WBA policy and the law.

- Open communication – Encouraging open, honest and full discussion about our policies and procedures.

- Raising questions – Raising and resolving questions about ethical business conduct.

- Reporting violations – Reporting actual or perceived Code, policy or legal violations to management, the Global Chief Compliance and Ethics Officer or using one of the confidential reporting telephone lines/website addresses in Appendix A.

- Cooperation – Assisting with any audit, compliance assessment, legal or other internal inquiry with candid, accurate and complete information.

- Non-retaliation – Ensuring that no punishment or retaliation occurs against anyone for raising a concern in good-faith. "Good faith" means that the report was made out of an honest and genuine concern without ulterior motive.

### b. Publication and amendments

The current version of the Code is posted and maintained on the WBA website at www.WBA.com >Investor Relations >Corporate Governance >Code of Conduct and Business Ethics. Amendments are also posted on the website.

### c. We are all accountable

Whatever your role is with WBA, your actions represent WBA, and you must always do your best to uphold WBA's reputation. Our success depends on each of us accepting personal responsibility for always doing the right thing. We must accept the obligation to stop or prevent actions that could harm our customers, our colleagues, or WBA's reputation and to report any such actions as soon as we learn of them.



### d. Members of management have additional responsibilities

Performing honestly and with integrity is an obligation we all share. Members of management are expected to lead by example and act as role models. As a manager you must: create a culture of compliance in which employees understand their responsibilities and feel comfortable raising concerns without fear of retaliation; encourage ethical conduct and compliance with the law by personally leading compliance efforts; consider compliance efforts when evaluating and rewarding employees; and ensure that employees understand that business results are never more important than ethical conduct and compliance with WBA policies.



To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com

7



You must also strive to create a positive work environment where employees feel comfortable asking for help and raising concerns about this Code, WBA policies or the law. You must be alert to any situations or actions that may violate the letter or spirit of the Code or WBA policy or that may damage WBA's reputation. It is important that, as a member of management, you take immediate action to address such situations. As a manager, you must:

- Ensure the employees you supervise understand their responsibilities under the Code, WBA policies and the law.

- Discuss the Code with your employees and reinforce the importance of ethical conduct, compliance with the Code, WBA policy and the law.

- Make sure your employees know they can come to you with questions and concerns, without fear of retaliation, and that you'll listen and respond appropriately.

- Never ignore any type of misconduct or retaliation against an employee.

- Never retaliate against an employee for raising questions or issues, in good faith, to those outside their chain of command (for example the confidential reporting telephone lines/website addresses).

- Never encourage or direct employees to achieve business results at the expense of ethical conduct or compliance with the Code, WBA policy or the law.

- Always act to stop violations of the Code, WBA policy or the law by those supervised.

- Provide advice and guidance on interpreting the Code and promote the requirements of the Code.

As a manager, if you are approached with a question or concern related to the Code or WBA policy, listen carefully and give the employee your complete attention. Ask for clarification and additional information. Answer any questions if you can, but do not feel that you must give an immediate response. Seek help if you need it (see section II.e). If an employee raises a concern that may require an investigation, contact your human resources or legal representative or the Global Chief Compliance and Ethics Officer.

When a manager receives a report of a situation that may be unethical or potentially damaging to WBA's reputation, or suspects that one exists, he or she must promptly notify the Global Chief Compliance and Ethics Officer or use one of the confidential reporting telephone lines/website addresses in Appendix A and work to resolve the issue. A manager who knew about or should have known about misconduct and does not act promptly to report it and cooperate with an investigation to correct the situation will be subject to disciplinary action up to and including dismissal.

**e. Where we can seek help**

If you are ever unsure about the best course of action, there are many WBA resources available to help you. You may raise issues or concerns in a number of ways:

- To your manager,

- Another member of management,

- Global Chief Compliance and Ethics Officer,

- Executive Vice President, Global Chief Administrative Officer and General Counsel,

- Vice President, Global Internal Audit, or

- One of the confidential reporting telephone lines/ website addresses in Appendix A.

WBA is committed to reviewing, evaluating and responding to all reports of misconduct—big or small. Considering our need to investigate and comply with WBA obligations, WBA will make every effort to protect the confidentiality of any person who comes forward with information, as well as the information itself.

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com

f. No retaliation

WBA does not tolerate retaliation against anyone who raises a legal or ethical concern, reports misconduct in good faith or participates in an investigation.

Here are some examples of retaliation:

- Unreasonable schedule changes that are outside of the business need and/or the employees request after reporting an issue;

- Unreasonable denial or delay in promotion;

- Unreasonable exclusion from meetings, unreasonable decisions, unreasonable denial of administrative support, or unreasonably reassigning job duties;

- Unreasonable exclusion from training that contributes to professional advancement;

- Being reprimanded for contacting a member of management, the Global Chief Compliance and Ethics Officer, or the confidential reporting telephone lines/ website addresses in Appendix A;

- Being verbally abused or unreasonably reprimanded by your manager or someone in management.

**g. Open door environment**

Promoting an open door environment, where employees are free to contact any member of management without fear of retaliation, is a key part of our culture. It encourages us to present ideas, raise concerns and ask questions—including those of a legal or ethical nature—without fear of retaliation. You are encouraged to address situations first with your manager, who is often best able to resolve the issue. In certain cases, you may feel uncomfortable discussing a matter with your manager, or you might be unable to reach a satisfactory solution. If this is the case, you may speak with any other member of management, the Global Chief Compliance and Ethics Officer, or use one of the confidential reporting telephone lines/website addresses listed in Appendix A. You will never be punished or retaliated against for making good faith use of the open door process.

**h. What happens if you violate our Code?**

To maintain the highest standards of integrity, we must commit ourselves to complying with our Code, WBA policy and procedures and applicable laws and regulations. Violations of our Code not only damage WBA's standing in the communities we serve—they may also be illegal. WBA will take the appropriate disciplinary action in response to each case, up to and including dismissal. In addition, employees involved may be subject to government fines or criminal or civil liability.

> You are encouraged to address situations first with your manager, who is often best able to resolve the issue.

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com

9





**Q.**

What should I do if my manager or someone in management asks me to do something that I think violates the Code or is illegal?

**A.**

A. Don't do it! No matter who asks you, if you have any doubts in your mind whatsoever, you should refuse to comply. First, make sure there is no misunderstanding as to what is being asked of you, then talk to your manager, another member of management, the Global Chief Compliance and Ethics Officer, or use one of the confidential reporting telephone lines/website addresses in Appendix A.

**Q.**

I reported an allegation six months ago. Ever since, my manager has stopped including me in several meetings. Is this retaliation?

**A.**

Significant changes in how you're treated may be retaliation. If your manager treats you differently after reporting an allegation, you should raise your concern to management through the open door process, by contacting the Global Chief Compliance and Ethics Officer or using one of the confidential reporting telephone lines/website addresses listed in Appendix A.



### i. Asking questions and raising concerns

If you have a concern, WBA needs to hear from you. If you ever feel your integrity or the integrity of WBA is being compromised, talk with your manager, another member of management or the Global Chief Compliance and Ethics Officer. It is also important to support those who raise concerns in good faith and cooperate with investigations when they happen. Educating yourself about the right choices is a big part of making integrity real every day. By regularly reviewing and understanding our Code and policies, we become more aware of ethical issues and are better prepared to handle issues as they arise.

The confidential reporting telephone lines/website addresses listed in Appendix A are managed for WBA by independent companies that provide reporting services for hundreds of companies worldwide. **They are available 24 hours a day, seven days a week and in local languages.** You may remain anonymous, and whether or not you give your name, your call will not be recorded. Information received by the independent companies is relayed to the WBA Compliance Office for further investigation and review as appropriate. The confidential reporting telephone lines/website addresses listed in Appendix A can be used to ask a question, obtain guidance, or report an integrity concern. The confidential reporting telephone line/website address are options that are made available to you to report your concerns if you feel uncomfortable doing so in person.

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com.

11

# WBA Code of Conduct and Business Ethics Decision Guide



# III. A Foundation of Trust for Our Customers

WBA employees must always follow the highest standards of integrity and ethics when interacting with our customers and patients. Even employees who do not interact with customers must be aware that the decisions they make and the work they perform ultimately affect our customers.

### a. We uphold our trustworthy reputation through product safety

Our customers count on us to sell safe, reliable products that meet the highest quality and safety standards. In our long history, we have earned our customers' trust by sticking to this principle.

As part of our commitment to exceeding our customers' expectations, we must also ensure that we purchase only the highest quality products from our suppliers. If you become aware of any defective products or other issues that could pose a health or safety risk, you have a responsibility to report the matter immediately.

### b. We provide quality, dependable services our customers can count on

Due to our unique standing as a global pharmacy-led, health and wellbeing enterprise, we must maintain our commitment to the integrity of our products and services. Many of our customers rely on our pharmacists and other healthcare providers for advice and dependable service. Those professionals who are required to maintain current licenses, certifications or registrations, must follow standards of ethics that correspond with their occupations. Further, you may not give any type of medical, pharmaceutical or other professional advice unless you are qualified to do so.

### c. We market our products and services honestly

We must preserve WBA's principles of integrity and honesty when we market our products—whether in any advertising, promotions, packaging, or labeling. Our customers' trust is one of our most valuable assets, and we are committed to maintaining that confidence.

Our marketing materials and WBA communications are meant to inform our customers about our products and services. They are expected to meet all industry standards that govern advertising and promotion. As such, we must follow all relevant laws and regulations regarding the marketing of our products, services and WBA's brands. In addition, we must never falsely represent any of our competitors' products or services or engage in any deceptive marketing practices.



Q.
As a manager, I received a communication that a certain product is being recalled due to quality concerns. I have some other tasks that I'd like to complete before removing the product from the sales floor. Is that okay?

A.
**No. Our customers trust us to provide safe, quality products. The recalled item should be removed from the sales floor immediately. You must focus on maintaining our customers' safety and complete the other tasks later.**

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com.

13



#### d. We expect our suppliers to uphold our values

We rely on our suppliers' and other business partners' integrity in all our dealings, and we expect them to assure the safety and performance of their products and services. We pursue legally compliant ways to make the most reliable purchasing decisions based on cost, product and quality, so that we can deliver quality goods at competitive prices to our customers.

WBA develops lasting relationships with suppliers who meet our high standards of business ethics. Our standing in the communities we serve is based on the trust that those communities place with us. To maintain that trust and continue to deliver the best products to our customers, we follow all WBA procurement policies in our purchasing interactions. We will not purchase products from a supplier who uses forced or bonded labor or child labor. We respect all applicable laws establishing a minimum age for employment to support the end of child labor worldwide and we expect our suppliers to do the same. We will also strive to ensure that slavery and human trafficking is not taking place within any of our supply chain business partners and will not tolerate such activities either within the supply chain or within any part of WBA's business.

We have audit processes in place, however any employee who becomes aware of a supplier operating unethically must immediately report the supplier to our Global Chief Compliance and Ethics Officer or the Executive Vice President, Global Chief Administrative Officer and General Counsel.

#### e. We protect the private information and intellectual property of others

WBA is committed to protecting personal and confidential information about our customers and employees that we may collect in the course of doing business. When you handle personal and confidential information, you must do so ethically and in accordance with applicable policies, procedures, laws and regulations (collectively "Rules") that govern the processing of personal information.   You are obligated to protect personal and confidential information from inappropriate collection, access, use, maintenance, transfer and disclosure.

Access to personal information is strictly prohibited unless necessary for authorized business purposes relating to specific and approved job responsibilities. Such information may only be collected, accessed, used, maintained, transferred and disclosed in accordance with applicable Rules. Access to personal and confidential information for personal knowledge or gain is strictly prohibited by our policies. Employees that are uncertain about how these Rules apply to their job responsibilities should contact their manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A.

We must never knowingly violate the intellectual property rights of others. Those of us with marketing or advertising responsibilities should be particularly careful when preparing advertising or promotional materials that use the name, printed materials, or trademarks of another company. As a general rule, we may not make unauthorized copies of any copyrighted material. Further, we may not install or distribute software products on WBA-owned computers without an appropriate license.

WBA respects the confidential information of other companies and their employees. Disclosure of other companies' confidential information, whether obtained directly or from a third party, could form the basis for legal action. If you inadvertently come into possession of such information which you reasonably believe to be the confidential information of another company, you should report it immediately to your manager, legal department or to the Global Chief Compliance and Ethics Officer.

If anyone asks or pressures you to divulge confidential information of other companies, you should report the matter to your manager, another member of management or the Global Chief Compliance and Ethics Officer.

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com.



Never use or share any confidential information or trade secrets divulged to you by a third party, whether intentionally or unintentionally. In limited circumstances, however, sharing of information may be permitted if all relevant parties have signed an appropriate legal agreement permitting such sharing of information. If you are unsure of how to use information you have received, contact your manager, another member of management, your legal department or the Global Chief Compliance and Ethics Officer.

**f. We uphold the competition and antitrust laws that apply to our work**

WBA requires all employees to fully comply with competition laws (known as antitrust laws in the U.S.) of every country, state and locality where WBA does business or attempts to do business. Competition laws throughout the world prohibit agreements among existing or potential competitors that harm competition. The key to compliance is independence. WBA must act independently in its business activities: setting prices, discounts, promotions, and terms of purchase and sale; selecting customers, distributors and suppliers; and choosing the products to produce and how much to sell. These laws often are complex and vary considerably from country to country—both in the scope of their coverage and their geographic reach. Conduct permissible in one country may be unlawful in another. Penalties for violation can be severe.

If your job involves sales, marketing or procurement, it's important that you understand how they affect your day-to-day work and avoid conduct that might even suggest a violation. Examples of anti-competitive behaviors include:

- Discussing bids or prices with competitors or agreeing to divide customers, markets or territories.

- Discriminating in the prices, terms and services you offer to similarly situated customers.

- Entering into "tying" arrangements where a customer is required, as a condition of buying one product, to have to buy something else.

- Making disrespectful or uncomplimentary comments about our competitors' products or services.

- Agreeing with competitors to "target" certain customers, products, services or geographic territories.

- Agreeing to boycott a customer, supplier, licensor or licensee.

If a competitor tries to engage you in a discussion on any of the above-mentioned behaviors, even informally, you must end the conversation immediately and report the incident to the Global Chief Compliance and Ethics Officer or the Executive Vice President, Global Chief Administrative Officer and General Counsel. We should be especially mindful during trade association meetings or conferences where we are likely to have more frequent interactions with our competitors. Remember, we must avoid even the appearance of unethical business practices.

Competition laws can be challenging to grasp, and violations carry serious penalties—both civil and criminal—for the employees involved and WBA. If your job involves sales, marketing or procurement, you must know and understand these laws as they apply to your work. For the specific rules that apply to your business, contact the Executive Vice President, Global Chief Administrative Officer and General Counsel or the Global Chief Compliance and Ethics Officer.

**g. We obtain competitive information fairly**

Remaining current on market practices and developments is vital to the continued success of WBA. While we recognize the importance of obtaining information we must only do so in a lawful and ethical manner. This means we obtain information only through publicly available resources. We also protect any information provided to us in confidence by our suppliers and other business partners.

To ask a question or report a suspected violation of the Code, WBA policy or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com

15



We must not ask our colleagues to disclose any confidential information about their previous employers. When we come to possess information from suppliers or other business partners, we must take care to protect it as we would WBA's own proprietary data.

### h. We work on government contracts and programs lawfully and ethically

Many of our customers rely on our ability to provide the services they need through government-backed healthcare programs (such as Medicare/Medicaid in the U.S. and the NHS in the U.K.) and other government supported programs. When working on potential or existing government contracts or funded programs, it is critical that we adhere to all of the laws, regulations and procedures that apply to these contracts and programs. These rules are often much stricter and more complex than those that govern our other contracts and vary considerably from country to country.

If your work involves government contracts, government-funded programs, or complying with government program parameters, you have a duty to familiarize yourself with the relevant laws and regulations that affect your job. To seek help in doing so, contact your legal department or the Global Chief Compliance and Ethics Officer. Please note that violations of these rules can result in substantial penalties, the loss of future government contracts, exclusion from government funded programs and even civil liability and/or criminal prosecution for the employees involved and WBA.

### i. We maintain appropriate relationships with healthcare professionals

Our relationships with healthcare professionals are heavily regulated and the rules are strictly enforced. A healthcare professional is any individual or entity, directly or indirectly involved in the delivery of healthcare that can purchase, prescribe, lease, recommend or use our healthcare products or services. The laws that govern paying, providing or offering anything of value to healthcare professionals such as gifts, meals, entertainment or grants are complex.

The consequences for failing to comply with these laws can result in significant monetary and even criminal penalties. It is important that you understand and comply with these laws and WBA policy when dealing with healthcare professionals. If you have questions or need assistance determining whether a particular relationship is appropriate, contact the Global Chief Compliance and Ethics Officer or the Executive Vice President, Global Chief Administrative Officer and General Counsel.

**Q.**
I recently joined WBA as a marketing manager and I have considerable correspondence in my possession from my previous employer regarding products and pricing on products. Can I share the data with WBA sales people?

**A.**
No, whether or not the data is marked as "confidential" or "proprietary," it cannot be used by WBA and should not be brought onto company premises. You should return these files to their rightful owner.

**a. We foster diversity and inclusion in our workplace**

We believe fostering diversity and promoting inclusive hiring practices in the workplace encourages a wider range of abilities and experiences, and helps us attract the best talent possible. Diversity helps inspire the innovation that drives our business and helps enhance the ideas that provide our competitive advantage as we serve consumers from all walks of life. Our hiring decisions are based solely on merit. We never make any employment-related decisions based upon a person's race, color, gender, age, religion, disability, sexual orientation, national origin, former military status, marital status or any other basis protected by law. Diversity and inclusion are key aspects of WBA's strong value system and culture.

Diversity and inclusion at WBA is a fundamental element of our vision to be the first choice for pharmacy, well-being and beauty — caring for people and communities around the world. We recognize the impact diversity and inclusion is having on where we do business — and with whom. Therefore we strive to leverage the diverse experiences and perspectives of our people to better serve our customers across the globe, expand our research and drive superior business performance. As the first global pharmacy-led, health and wellbeing enterprise, we recognize the importance of increasing access in underserved markets. As such, we believe we are uniquely positioned to be an important contributor on the matter of providing trusted health care services.

**b. We respect each other and do not tolerate harassment**

We are committed to treating each other with respect. Each of us is responsible for ensuring that our workplace is free from any type of harassment. Harassment is any unwelcome conduct that creates an intimidating or offensive work environment—whether it is of a sexual nature or not. Harassment can include physical actions, spoken or written remarks and pictures or videos. In any case, harassment is offensive and may expose the individuals involved and WBA to legal liability. Therefore, WBA will not tolerate harassment of any kind.

If you experience or witness any act of discrimination or harassment, you should report it immediately. You will not face retaliation for making a report in good faith.

**c. We strive to create a safe and healthy work environment**

Violence and threats of violence are prohibited. WBA will not stand for any threatening behavior, even if made in a seemingly joking fashion. You must never bring any weapons into the workplace.

### What is harassment? It includes, but is not limited to:

| | | |
|---|---|---|
| Offensive jokes | Display of offensive material | Threatened or actual violence |
| Conduct of a sexual, racial or other nature that unreasonably interferes with an employee's work performance or creates an intimidating, hostile or offensive working environment | | Threat of dismissal or failure to promote based on sex, race, age, color, national origin, disability, religion or sexual orientation |
| Physical or verbal abuse | Bullying, humiliation or intimidation | Unwanted physical contact |

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com

17



**Q.**

I had a recent business trip with my manager and a few of my colleagues. At dinner, they were loud and obnoxious, and told inappropriate jokes. Their behavior made me uncomfortable, and I'm starting to dread having to work with them. What can I do?

**A.**

Ideally, you would have said something to them at the time of the incident, and they should have stopped the inappropriate behavior. If you didn't feel comfortable saying something at the time, or still feel uncomfortable with the situation, it's time for you to let WBA know. We are all expected to be on our best behavior while representing WBA, including while traveling. Not only did your colleagues' actions reflect poorly on WBA, they also made you uncomfortable. You should report the behavior immediately to your local human resources or legal representative.



Our shareholders trust us to protect WBA's assets - both physical and intangible.

Drugs and alcohol impair judgment and in the workplace can affect everyone's safety. You may not possess, distribute or be under the influence of alcohol or drugs while working or while conducting WBA business. If you have any questions or need assistance with a substance abuse problem, please contact your human resources representative or use one of the confidential reporting telephone lines/website addresses listed in Appendix A.

Certain safety laws and standards are in place to ensure each of us enjoys a safe and healthy work environment. We all have a responsibility to uphold these laws and to follow any safety standards and guidelines specific to our jobs. We should always report any concerns about misconduct or hazardous conditions that may threaten the safety of our workplace. Our leadership is committed to the safety, health, and well-being of our employees, our business partners, and our customers.

### d. We work to protect WBA's assets

Our shareholders trust us to protect WBA's assets—both physical and intangible. Theft, fraud, embezzlement, or misappropriation of WBA assets, or the property of colleagues, customers, or business partners, is prohibited. Under no circumstances will we engage in fraudulent conduct. A fraudulent act is a dishonest act, through false representation, failure to disclose information or abuse of position, with the intent of causing a gain for self or others, or loss to another. This includes, but is not limited to, theft of products, money, assets, information and other WBA property. Examples include forgery or alteration of checks or any other documents, misappropriation of funds or other assets, impropriety in handling or reporting of money or financial transactions, theft or dishonesty, and destruction or disappearance of records, fixtures, or equipment.

Our physical assets include WBA's records, computers, products, equipment and the like. We must be considerate while utilizing these assets, and protect them at all times from loss, damage, theft and misuse. Intangible assets include our reputation, all brands, such as Walgreens, Boots, Alliance Healthcare or certain product lines, such as No7, and any sensitive or confidential information about WBA. Your obligation to protect this information continues even after your employment ends.

WBA's intellectual property is a valuable asset. "Intellectual property" includes copyrights, patents, trademarks, trade secrets, logos and other intangible industrial or commercial property. These creations are protected by law, and we are obligated to protect them. Also, keep in mind that—to the extent permitted by law—the rights to certain intellectual property are assigned to WBA. This applies to any such materials we create on WBA's time and expense or within the scope of the duties we perform for WBA.

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com.

19





**Q.**

I know that some of the information I work with is confidential. Does this mean I can't talk about it with anyone, even other employees?

**A.**

Confidential means that you should keep the information secure. You should discuss such information only with those who need to know about it for business purposes. If you have any questions about who you can discuss the information with, you should ask your manager.

**Q.**

I noticed activities that may be creating a safety and environmental hazard, but it is not in my area, and I do not want to get involved. I do not have to report it, do I?

**A.**

This is not the best way to handle your concern. Safety and the environment are every employee's "area." Report your concern to your manager. If you are uncomfortable doing so, then you should contact another member of management, the Global Chief Compliance and Ethics Officer or use one of the confidential reporting telephone lines/website addresses listed in Appendix A.



Employees should be aware that the improper and inappropriate use of social media can pose tremendous risks to WBA, including:

Social media refers to the external online tools used to share content, profiles, opinions and experiences. Social media tools include, but are not limited to:

Disclosure of WBA confidential and proprietary information

Professional networking sites (e.g., LinkedIn)

Infringement of third-party intellectual property rights

Social networking sites (e.g., Facebook, Tumblr)

Harassment

Video and photo sharing websites (e.g., YouTube, Instagram)

Privacy violations

Micro-blogging sites (e.g., Twitter)

Potential damage to reputation and brand

Personal websites and blogs

Forums and discussion boards (e.g. Yahoo! Groups, Google Groups, Yelp)

**Q.**

**Sometimes I use my company computer for personal reasons. I do simple things, like checking my bank account or sending an email to my spouse to coordinate rides for our children. Is this okay?**

A.

**Reasonable personal use of company resources is allowed. However, remember that you may not send or view inappropriate or illegal material or install unapproved software, even when using company computers for personal reasons. Your use also must not interfere with your daily work. If you are unsure, you should check with your manager before using the resource for personal reasons. Inappropriate use of company computers may result in disciplinary actions.**

We are also expected to protect the intellectual property of our vendors and suppliers, as well as other confidential information acquired in the course of our business dealings. We are able to provide top-quality products because we have cultivated strong relationships with our vendors and suppliers. It is therefore critical that we maintain those relationships by honoring our vendors' and suppliers' proprietary information and protecting it from unauthorized disclosure or misuse.

**e. We safeguard each other's personal information**

True to our values of trust and care, WBA is committed to protecting personal and confidential information about our employees that we may collect in the course of doing business. When you handle personal and confidential information, you must do so ethically and in accordance with applicable policies, procedures, laws and regulations (collectively "Rules") that govern the processing of personal information. You are obligated to protect personal and confidential information from inappropriate collection, access, use, maintenance, transfer and disclosure.

Access to personal information is strictly prohibited unless necessary for authorized business purposes relating to an employees' specific and approved job responsibilities and such information may only be collected, accessed, used, maintained, transferred and disclosed in accordance with applicable Rules. Access to personal and confidential information for personal knowledge or gain is strictly prohibited by our policies. Employees that are uncertain about how these Rules apply to their job responsibilities should contact their manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A.

**f. We use our computer systems appropriately**

While limited personal use of our computer and network systems is acceptable, it should not detract from our work for WBA. We should never use WBA's computers or network systems for inappropriate conduct, such as viewing obscene or sexually explicit materials, spreading profanity or derogatory remarks or communicating harassing or discriminatory statements. WBA reserves the right to block access to inappropriate sites. Please also be aware that WBA may monitor all data and communications to the extent permitted by local law. WBA also retains the right to report any suspected or actual violations of the law to the appropriate authorities.

We always need to use our computer and network systems appropriately. This means composing e-mails and other electronic communications professionally. All business communications may later be reviewed and interpreted by other parties, so take care in how you compose your thoughts because electronic messages can be forwarded without your consent. In addition, you may not post WBA's confidential information to Internet chat rooms, message forums or any other public forum. It is important to keep in mind that WBA reserves the right to monitor use of company computers, mobile devices, and network systems.

**g. We permit responsible individual social networking and blogging**

WBA recognizes that you may use social media to participate in discussions, but you need to do so carefully and responsibly. If an individual chooses to be identified as an employee of WBA or includes other identifying information concerning WBA while participating in social media discussions, they must do so within the policy guidelines of his or her business unit.



**Q.**
I overheard a co-worker threaten another employee. I'm not sure if the threatened employee reported the incident. What should I do?

**A.**
You have a responsibility to act if you see, hear or suspect a threat of violence in the workplace. Report the incident immediately to your local human resources or legal representative.

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com.

21





**Q.**

My manager is exerting pressure on me to "make the numbers work." What should I do?

**A.**

Your responsibility is to be honest and accurate. If you feel pressured to do otherwise, contact the Vice President, Global Internal Audit or Global Chief Compliance and Ethics Officer or use one of the confidential reporting telephone lines/website addresses listed in Appendix A.

**Q.**

Ben learns that his department will be examined by a regulatory agency and a Legal Hold Notice has been issued. He knows that some of the documents the agency has requested contain inaccurate information, so he shreds these documents. Is he doing the right thing?

**A.**

A. No. Ben must not conceal, alter or destroy any documents that have been requested by a regulator. Without the documents he has shredded, Ben cannot provide the examiner with a complete response. This would qualify as destruction of documents which is against the law and carries severe consequences.

Case: 1:21-cv-05663 Document #: 10 Filed: 01/03/22 Page 92 of 106 PageID #:202

**a. We keep honest, accurate financial books and records**

We are committed to making accurate, timely, complete, fair and clear disclosures in our external reports, including reports to regulatory bodies such as the Securities and Exchange Commission (SEC). It is our duty to ensure that our business records reflect an honest and accurate picture of our financial position. For this reason, it is important to keep accurate records of receipts, sales, expenses, corporate assets and corporate liabilities. If you become aware of any accounting or auditing irregularity, you have a duty to report it immediately to the Vice President, Global Internal Audit or Global Chief Compliance and Ethics Officer so that WBA can take the appropriate steps to resolve the matter.

Furthermore, each of us must cooperate with requests by auditors or government investigators. If management, auditors or government authorities request information, we must not conceal, alter or destroy any of those requested records. Falsifying business records can lead to dismissal and even criminal prosecution. If you become aware of or suspect that WBA is under investigation, you are required to involve the Global Chief Compliance and Ethics Officer or the Executive Vice President, Global Chief Administrative Officer and General Counsel immediately.

**b. We maintain records in compliance with the law and WBA policy**

There are many laws and regulations that govern how we maintain documents, including business, financial and healthcare records. Each of us is responsible for ensuring that records are retained and disposed of in accordance with all applicable laws and regulations, as well as licensing and accreditation requirements. Records include information stored in various formats, including paper, electronic, audio and video.

If you are a person with knowledge of records related to litigation, an investigation or other dispute, you may receive a "Legal Hold Notice" (or, if you are situated outside of the US, a similar request for information to be preserved and retained). Each person who receives a Legal Hold Notice is responsible for retaining original records related to the dispute, as directed in the Legal Hold Notice. Failure to comply with a Legal Hold Notice could result in disciplinary action up to and including dismissal.

**c. We avoid conflict of interest situations**

To uphold WBA's reputation, we must be alert to any situations that may create a conflict of interest, whether real or perceived. A conflict of interest occurs when there is an actual or apparent interference with our ability to make objective business decisions because of our personal relationships or loyalties. Certain situations are more likely to hinder our capabilities in making good judgment calls, and we must take care to avoid those circumstances. If you have knowledge about a situation that may be a conflict of interest, you should immediately disclose it to the Global Chief Compliance and Ethics Officer or use one of the confidential reporting telephone lines/website addresses listed in Appendix A.

Conflicts of interest could include:

- Serving as an officer or director of or having ownership interest that exceeds 1% of the outstanding shares in another company that does business or competes with WBA

- Having a family member that has ownership interest in another company that does business or competes with WBA

- Using WBA information for your own personal gain, to benefit a family member or another company for which you serve as an officer or director, or in which you have financial interest

- Participating in business transactions for your own personal gain based on information or relationships developed as a WBA employee

- Failing to disclose that you are closely related to someone, such as a vendor or customer who has sought or is seeking a financial relationship with WBA

- Having a relationship with a commercial entity that administers or delivers healthcare benefits (for programs such as Medicare/ Medicaid in the U.S. and NHS in the U.K.) which may include producing, marketing, reselling, distributing, or providing healthcare related products and/or services

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com.

23



Employees must register gifts given, received, and declined according to policy using the form appropriate for their work location.

Keep in mind that rules governing the giving of gifts, favors and entertainment to any government official (or their family members), or healthcare providers/referral sources (or their family members) are much stricter than those set forth in this section. In addition, no gifts, favors, or entertainment can be given to any government official or foreign businesses without prior notice and approval by the Global Chief Compliance and Ethics Officer or his/her delegate.

For further information on gifts and entertainment, including financial thresholds, required approvals, gift registries, and interactions with government officials, see the WBA Anti-corruption, Bribery and Conflict of Interest Policy-Section 5.

### e. We avoid conducting business with friends and relatives

Another common conflict of interest can occur when doing business with or while supervising family or friends. We are not permitted to directly oversee immediate family members. If you are put in such a situation, you should disclose it to a member of management immediately so that reassignments can be made. In addition, you may not enter WBA into a business relationship with a friend or family member or a business owned or operated by a friend or family member without the prior approval of the Global Chief Compliance and Ethics Officer. You must avoid any scenario where you stand to gain personally from WBA related dealings or where there may be any appearance of favoritism.

### f. We limit conflicting outside business employment

You may have outside business interests or employment, as long as those interests do not interfere or conflict with your current position and responsibilities for WBA. In general, this means you may not work for or have a significant financial interest (greater than 1%) in a competitor, supplier or customer unless permitted under a contract of employment.

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com



**Q.**

One of WBA's office equipment suppliers has offered to give me the same discount WBA has negotiated to buy furniture and equipment for my home office. Is this acceptable?

**A.**

No. A supplier discount is only acceptable if it is available to all WBA employees. If the discount is offered only to you, then it is not appropriate. This situation could be a problem from a variety of perspectives: an improper gift, an attempt to influence WBA business decisions and an appearance problem.

Many laws impose strict rules governing business relationships, contract negotiations and purchases from various government agencies. Because of this, all WBA employees must conduct themselves in a manner that avoids any dealings that might be perceived as attempts to influence public officials in the performance of their official duties.

Many laws restrict companies that do business with the government from hiring as an employee or retaining as a consultant a present or former government employee other than secretarial, clerical, or other similar grade employees. These restrictions also cover informal arrangements for prospective employment under certain circumstances.

If an employee wishes to engage in a transaction or activity, which is, or potentially may be a conflict, the employee must first make a full written disclosure to the Global Chief Compliance and Ethics Officer. This includes discussing proposed employment or retention with any current or any former government employee who left government employment within the past two years. Employees who fail to report actual or potential conflicts of interest will be subject to appropriate disciplinary action, up to and including termination of employment.

Following this procedure will ensure that conflict of interest provisions are not violated. For further information on conflict of interest issues see the WBA Anti-corruption, Bribery and Conflict of Interest Policy-Section 10.

Additional common conflict of interest situations are described below, as well as guidelines you should follow in dealing with them. Please remember that these guidelines also apply to members of your "immediate family." This includes your spouse, domestic partner, parents, children, siblings, in-laws and anyone who resides in your home.

**d. We allow modest, occasional gifts and entertainment**

Business gifts and entertainment on a modest scale are commonly used to build goodwill and strengthen working relationships among suppliers and other business associates. Providing or accepting occasional meals, small company mementoes and tickets to sporting and cultural events may be appropriate in certain circumstances. However, if offers of gifts or entertainment are frequent or of substantial value, they may create the appearance of, or an actual conflict of interest or illicit payment.

When deciding on the appropriateness of giving or receiving a business gift or entertainment, consider:

- the suitability of the gift or entertainment given your position at WBA;

- the impact of the gift or entertainment on building positive business relations with the recipient;

- how the gift or entertainment might look to an outsider; and

- the value of the individual gift or entertainment, and/or the sum of gifts or entertainment from an entity over time:

  » For gifts received, approval is required over $100 (gifts may not exceed $250 individually, or $500 annually)

  » For entertainment, approval is required over $100 (a representative of the business partner must be present).

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com.

25

You may not serve as a director, trustee or officer of another company, or in a similar capacity, without the prior written approval of the WBA Corporate Secretary and the Global Chief Compliance and Ethics Officer. This rule does not apply to political, non-profit or social organizations, or to residential boards whose activities do not conflict with WBA's interests.

You may join industry or trade associations with the approval of your manager, as long as you ensure that any related activities are consistent with WBA's interests.

Some examples of possible conflicts of interest:

- An employee works part time in the evening for a company that makes a product that competes with the products of his full time employer.

- An employee has secondary employment as a pharmacy technician at another retailer.

### g. We restrict business opportunities for personal gain

We may not accept business opportunities, commissions or advantageous financial arrangements from a customer, supplier or business partner of WBA for our personal benefit. In addition, we may not purchase goods or services from WBA vendors for personal use on terms other than those available to the general public or established by WBA policy.

If you become aware of any business opportunities in which WBA might be interested, you are required to bring them to the attention of your manager and not take advantage of those prospects for your personal gain.

### h. We uphold insider trading laws

WBA expects all of its employees, directors and other insiders to comply fully with applicable insider trading and securities laws. While working for WBA, it is possible that you could become aware of "material non-public" information about WBA or one of our business partners. Information is considered "material" if there is a substantial likelihood that a reasonable shareholder would consider it important in determining whether to buy, sell or hold, or engage in other transactions concerning, WBA securities, or if it would be viewed as having significantly altered the total mix of information available. Both positive and negative information may be material. Examples of information that may be material include: financial results, trends or forecasts; potential mergers, acquisitions, divestitures or joint ventures; and significant operational, regulatory, litigation, or contractual developments. Information is "non-public" until it has been widely distributed to the public and the public has had time to absorb and evaluate it.

It is illegal to purchase or sell securities on the basis of material non-public information. Until WBA has made this important information public, you must keep it confidential and may not use it for your own personal gain or that of others. This applies to stock, options or other securities of WBA or another company, as well as to transfers into or out of stock based retirement plans.



Q.
**If I hear that WBA is considering acquiring a company, may I buy stock in either WBA or the target company before it is announced?**

A.
**No, as a WBA employee such a transaction would be considered trading on the basis of information (insider trading) that has not been released to the public. Under U.S. Securities law, if such information is determined to be material "inside information," such a transaction would be illegal.**



**Q.**

May I accept a business meal from a supplier?

**A.**

In most circumstances, modest and infrequent business meals may be accepted. However, whenever a supplier pays for a meal, always consider the specific circumstances and whether your impartiality could be compromised or appear to others to be compromised. If the meal is offered during request for proposal (RFP) or tender process, you must always politely decline the invitation. Talk with your manager if you are unsure.

**Q.**

An outside organization offered to pay for my travel to an event they are hosting. May I accept it?

**A.**

It depends on who is offering it, the reason for travel and any risk of an actual or perceived conflict of interest. There are certain situations where it's permissible to accept reasonable travel and accommodations from a third party. Refer to the travel and business expense policy for your business unit for specific guidance or contact the Global Chief Compliance and Ethics Officer if you are unsure.

**Q.**

Joan, a supervisor, is responsible for finding the right person for an open position in her department. Since her cousin is well qualified, Joan hires her for the job. Is hiring her cousin a conflict of interest?

**A.**

Yes, through her actions Joan has created at least the appearance of a conflict of interest. Although Joan believes that her cousin is more qualified than any other candidate, because Joan may be biased, she should have disclosed this conflict to her manager. In addition, and for the same reasons, if Joan's cousin is hired, the cousin should not report to her.



**Q.**

I just found out that a customer is going to cancel a major contract with WBA. My father owns a lot of WBA stock. Can I tell him about the news so he can sell his WBA stock before he loses money?

**A.**

No. Providing material, nonpublic information to a family member in order to allow them to trade in WBA stock is a form of insider trading called "tipping" and is illegal. Both you and your father can be charged with insider trading and would be subject to penalties, loss of profits and possible time in jail.

**Q.**

A customer refuses to provide her address for a $3,000 money transfer to another country. Should I report this as a "suspicious person"?

**A.**

Any customer reluctant to provide the requested information should be reported as a "suspicious person" when processing financial transactions.

**Q.**

A customer asked me if I could split a $5,000 transaction into two transactions of $2,500 so they did not have to bother with the paperwork that may otherwise be involved. Should I process the transaction this way?

**A.**

No. If it's truly the same transaction, it should be processed as one transaction and the proper paperwork should be completely filled out and turned in for reporting to the government. If the customer refuses to comply, contact a member of management to assist you.



In the course of your job, you also may receive material non-public information about other companies. You must also hold this information confidential and may not trade in the securities of other companies on the basis of it. You must also refrain from disclosing material non-public information to others—including friends and family—to use for their own financial benefit (known as "tipping"). The consequences for violating insider-trading laws are severe, and punishment may include fines and imprisonment, as well as dismissal of employment. If your friends or family members trade in securities while in possession of material non-public information that you revealed to them, you are exposing them and yourself to potential criminal and civil liability, even if you do not personally take advantage of this information.

WBA has adopted an Insider Trading Policy, which is applicable to all employees, directors and other insiders, and which more fully sets forth your obligations regarding trading in the securities of WBA and other companies. The Insider Trading Policy is available on WBA's intranet site. You are required to become familiar with the policy and comply with it. Employees at the vice president level or above and others who regularly have access to material non-public information have additional obligations, including in some cases quarterly "blackout periods" or an obligation to pre-clear transactions with the legal team. These obligations—and more information about trading generally—are set forth in the WBA Insider Trading Policy.

**i. We comply with anti-money laundering laws**

People involved in criminal activity — e.g., terrorism, narcotics, bribery, and fraud — may try to "launder" the proceeds of their crimes through a series of transactions in order to 'clean' it and give it the appearance of being from legitimate sources. We all need to be vigilant of circumstances that may indicate improper transactions. We should be alert to the following activities:

Types of payments associated with money laundering, such as: multiple money orders, volume purchases of prepaid products such as gift cards or large cash transactions;

- A customer or other third party who is reluctant to provide complete information, provides false or suspicious information or is anxious to avoid reporting or recordkeeping requirements;

- Unusual domestic or foreign fund transfers that indicate scam activities or fraudulent schemes;

- Structuring a transaction to avoid requirements, such as conducting multiple transactions below the reportable threshold amounts;

- A customer wishes to pay with large amounts of cash or appears unconcerned with price, commissions or other transaction costs.

It is the responsibility of local management to ensure that WBA conducts business in accordance with all local legal requirements, including compliance with any currency reporting requirements.

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com.

29





**Q.**

I am told that in a particular country it is a common practice to pay a small "gratuity" to a customer prior to their purchase of a WBA product. Should I pay the "gratuity" so that I do not lose the business?

**A.**

No. We do not engage in business that is available only through improper or illegal payments. If you become aware of the use of gifts, bribes, gratuities, kickbacks, secret payments or inducements to anyone, including customers, their agents or employees (or members of their families), to generate business, you should contact your legal department or the Global Chief Compliance and Ethics Officer.

**Q.**

We use an agent to facilitate relations with local government officials. Recently he asked us to increase his commission significantly even though we have not expanded the scope of his responsibilities or perform additional work. I suspect he wishes to pass this money on to the local officials. What should I do?

**A.**

If you suspect that the agent is making illegal payments on WBA's behalf, WBA is under an obligation to investigate whether this is the case and to halt any such payments. You should report your suspicions to your manager, your legal department or the Global Chief Compliance and Ethics Officer.

### a. We comply with healthcare laws

WBA is committed to full healthcare law compliance internationally. All businesses must comply with all laws relating to the commercialization and distribution of healthcare products and the conduct of business in the healthcare industry. Businesses and their employees will ensure that they do not knowingly engage in unlawful trade in their products and that their business practices are directed at supporting only legitimate trade.

WBA fully supports the aims of governments and regulators in seeking to eliminate all forms of illegal pharmaceutical trade. Such trade deprives governments of revenues, promotes criminality, misleads consumers into buying products of dubious quality and hampers efforts to block underage sales. It also harms our brands, damages our reputation, devalues the investment in local operations and distribution networks and undermines the regulatory regimes governing the legitimate industry.

WBA will not engage in illegal or fraudulent healthcare payments or practices. We are regulated by many laws that are designed to prevent, detect and punish fraud, waste and abuse. Therefore, WBA prohibits employees from knowingly submitting false or fraudulent claims for healthcare services or products to any government agency or third party.

In general, healthcare laws seek to:

- Prevent any false or fraudulent claims to government sponsored healthcare programs.

- Ensure that decisions made by healthcare providers about patient treatment or product use are not influenced by personal gain.

- Reduce the cost of healthcare to support patients and promote the quality of healthcare services.

- Seek to eliminate all forms of unlawful pharmaceutical trade.

If you have any questions or concerns involving the various healthcare laws that apply to your area of work, please contact your manager, legal department or the Global Chief Compliance and Ethics Officer.

### b. We work to build sustainable supply chains

We want to ensure that the local and global suppliers that provide our goods and services are treated fairly and follow the same high standards that we have set for ourselves. Therefore, we strive to only purchase from suppliers who respect basic human rights and abide by the laws and regulations wherever they operate. In addition, we strive to work with suppliers who maintain WBA's commitment to fair wages and hours for all workers and who share our commitment to environmental and resource sustainability. If you suspect or know of any of WBA suppliers who do not act in accordance with our standards, you have a duty to WBA to report it.

### c. We comply with international trade laws

Various countries have a number of laws controlling the importation and exportation of goods. For example, it may be illegal to trade with certain countries specified by governments or with individuals and organizations against which the governments have imposed embargoes. Various customs laws also place restrictions on the importation and exportation of goods into certain countries. If your job involves trade with other countries, you need to be familiar with the processes and requirements that apply to your work. Each of us must be vigilant to ensure that we comply with trade laws and regulations in the countries where we do business. Consequences for violations of these laws are severe for both WBA and the employees involved.

In addition, we are prohibited from engaging in or appearing to support boycotts against certain countries or companies. We may be required by law to report any requests to participate in an unsanctioned boycott to various governments. For that reason, if you believe you have received a boycott request or have any questions about boycott activities, it is crucial that you notify your legal department or the Global Chief Compliance and Ethics Officer immediately.

### d. We comply with anti-corruption and bribery laws

WBA strives to maintain high ethical standards and requires its employees and others doing business with WBA, including its consultants, agents, intermediaries, and representatives, to comply with all applicable anti-bribery and corruption (collectively "ABAC") laws and other regulations that prohibit bribery, solicitation of bribery and the payment of kickbacks. These laws include the US Foreign Corrupt Practices Act, the UK Bribery Act and ABAC laws and regulations in all countries where WBA conducts its business. As part of WBA's commitment to ethical standards, we refuse to offer, authorize, give or promise bribes or "facilitation payments" or any questionable payments. A bribe is providing something of value to someone including government officials—including gifts, cash, and favors—in order to influence a business decision.

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com.

31



We have built a reputation of trust over the many years we have been in business.





We must never use our position of authority to compel or pressure another employee to participate in any political event or cause. Please speak with your manager if you need further guidance.

**g. We communicate with a single voice**

We have built a reputation of trust over the many years we have been in business. A part of maintaining that trust means communicating to our various stakeholders with a consistent and singular voice. To ensure our corporate communications are reliable and give a clear picture of the message we want to convey, any external communications must be made only by authorized representatives.

If you receive any inquiries from shareholders, analysts or other securities market professionals, you should refer them to WBA Investor Relations. Any media requests should be directed to your business unit's corporate communications area. If you have any further questions about whom to refer an outside inquiry on any topic, you should contact your legal department or the Global Chief Compliance and Ethics Officer or **wbacompliance@wba.com**.

**Q.**
**Q. I do volunteer work for a candidate for public office. May I ask my administrative assistant to type some documents and make copies on the company copy machine?**

**A.**
**No, the administrative assistant the company has provided you should only be used for WBA business. You are not permitted to use WBA resources for political purposes.**

A facilitation payment, sometimes called "speed" or "grease" payments, are generally defined as small payments made to secure or expedite the performance by a low level official of a routine or necessary action to which the person making the payment has legal or other entitlement. WBA prohibits facilitation payments as a matter of policy. Facilitation payments are illegal under the laws of almost every country in the world. If you believe that such a payment would be lawful and appropriate in any particular instance, you must receive an exception to this prohibition that is approved in advance of any payment, and in writing, by the Global Chief Compliance and Ethics Officer.

A government official is any officer or employee of a government or any department, agency, or of a public international organization, or any person acting in an official capacity for or on behalf of any such public international organization. All state-owned enterprises and joint venture entities with a state-owned interest would also fall within the definition.

The consequences for violating anti-bribery laws are severe, including fines, dismissal and imprisonment. You are required to report any government official who requests a bribe. Further, if you suspect a fellow employee is engaging in unethical or questionable conduct as it relates to bribery or kickbacks, you are required to report the behavior. Any such reports should be made to our Global Chief Compliance and Ethics Officer or the Executive Vice President, Global Chief Administrative Officer and General Counsel immediately. For more information review the WBA Anti-corruption, Bribery and Conflict of Interest Policy.

**e. We do our part to protect the environment**

As a responsible corporate citizen, we follow all relevant environmental laws, rules, and regulations in the places where we do business. But beyond regulatory compliance, we are committed to reducing the carbon footprint and environmental impact of our retail and pharmacy sites, our distribution centers, and our fleet through the use of energy efficient lighting, renewable energy, smart logistics, and recycling. The annual WBA Corporate Social Responsibility Report highlights the many ways our Company and businesses are supporting the community, environment, marketplace and workplace. If you become aware of any violation by WBA of any environmental laws or regulations, you should immediately notify your legal department or the Global Chief Compliance and Ethics Officer or use one of the confidential reporting telephone lines/ website addresses listed in Appendix A.

**f. We support our local communities**

As a good corporate citizen, WBA takes pride that its employees are leaders in our communities. Each of us is encouraged to be involved in community, volunteer and charitable activities. In fact, there are many opportunities for participating in volunteer efforts through your employment at WBA. We should, however, not identify ourselves as representatives of WBA at community events without prior approval from a member of management.

WBA respects your right to participate in the political activities that interest you. However, your involvement in political activities needs to be on your own time and at your own expense. You will not be reimbursed by WBA for any political donations you make. In addition, you must not use company time or resources while participating in or contributing to political or charitable causes. You should also never use WBA's name while taking part in these activities, and no company funds, property, or services are to be used to support any political party or candidate without the prior approval of the Executive Vice President, Global Chief Administrative Officer and General Counsel or the Global Chief Compliance and Ethics Officer.

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com

33

Appendix A – Confidential Reporting Telephone Lines and Website Addresses

The reporting telephone lines are toll-free telephone line reserved specifically for employee calls on ethics and compliance issues. The confidential reporting telephone lines and website addresses are an option that is made available to you to report your concerns if you feel uncomfortable doing so in person.

The confidential reporting telephone lines are staffed 24 hours a day, seven days a week, 365 days a year by outside firms experienced in handling sensitive calls and accepting calls in many languages. Callers may report anonymously.

**Chile**
(02) 2 938 20 49
www.reportit.me/cl

**China**
4001205993
www.reportit.me/cn

**Czech Republic**
800 142 633
www.reportit.me/cz

**Egypt**
Web Only
www.reportit.me/eg

**France**
0 800 914 164
www.reportit.me/fr

**Germany**
0 800 182 7126
www.ichhabewaszumelden.de

**Hong Kong**
800960689
www.reportit.me/hk

**Italy**
800 792 461
www.reportit.me/it

**Lithuania**
8800 31814
www.reportit.me/lt

**Mexico**
0 1800 123 7031
www.reportit.me/mx

**Netherlands**
0 800 024 9819
www.reportit.me/nl

**Norway**
800 11850
www.reportit.me/no

**Republic of Ireland**
1 800 812 938
www.reportit.me/ir

**Romania**
0 800 894133 or 0316 300036
www.reportit.me/ro

**Spain**
900 948 913
www.reportit.me/es

**Switzerland**
0 800-890011 then 855-223-1122
iwf.tnwgrc.com/wbad

**Thailand**
0 01 800 441 3116
www.reportit.me/th



**Turkey**
0 0800 448826266 or 0850 252 65
www.reportit.me/tr

**United Kingdom**
0 800 097 1132
www.reportit.me/uk

**USA (Boots Retail USA)**
1 844 708 0410
www.reportit.me/us

**USA (Walgreens)**
1 855-924-2633
www.tnwgrc.com/walgreens

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com.

# VII. Asking Questions and Raising Concerns

As mentioned earlier, our open door process is a key part of our culture. It is in place to encourage us to present ideas, raise concerns and ask questions—including those of a legal or ethical nature—without fear of retaliation. You are encouraged to address situations first with your manager, who is often best able to resolve the issue. In certain cases, you may feel uncomfortable discussing a matter with your manager, or you might be unable to reach a satisfactory solution. If this is the case, you should speak with any other member of management, the Global Chief Compliance and Ethics Officer, the Executive Vice President, Global Chief Administrative Officer and General Counsel or you may call a confidential reporting telephone lines/website addresses listed in Appendix A. You will never be punished or retaliated against for making good faith use of our open door process.

The confidential reporting telephone lines/website addresses listed in Appendix A are managed for WBA by independent companies that provides reporting services for hundreds of companies worldwide. It is available 24 hours a day, seven days a week. You may remain anonymous, and whether or not you give your name, your call will not be recorded. Information received by the independent companies is relayed to the WBA Compliance Office for further investigation and review as appropriate. The confidential reporting telephone lines/website addresses listed in Appendix A can be used to ask a question, obtain guidance, or report an integrity concern. The confidential reporting telephone line/website address are options that are made available to you to report your concerns if you feel uncomfortable doing so in person.

Remember: You have a responsibility to report unethical business conduct and known or suspected violations of the Code or other WBA policies. An issue cannot be addressed unless it is brought to the proper person's attention. Keep in mind that WBA does not tolerate retaliation against anyone who participates in an investigation, raises a legal or ethical concern, or reports misconduct in good faith. Good faith means that the report was made out of honest and genuine concern without ulterior motive.

All statements contained in this Code are intended to reflect general principles, and procedures. They do not represent contractual commitments on the part of WBA, and may be changed at any time without notice. Without limiting the generality of the foregoing, nothing in this Code should be construed to grant to any employee any right to continued employment or benefits under any employee benefit plan, program, or arrangement. Violations of this Code may result in disciplinary actions, including, if appropriate, dismissal of employment.

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com.

35



 Walgreens Boots Alliance



To ask a question or report a suspected violation of the Code, WBA Policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com.

**Contact Information**

Matt D'Ambrosio, Senior Vice President, Global Chief Compliance and Ethics Officer
+ 1 847 964 6519

Troy Kelly, Vice President, Global Internal Audit
+ 1 847 315 3741

Marco Pagni, Executive Vice President, Global Chief Administrative Officer and General Counsel
+ 1 847 315 3004

To ask a question or report a suspected violation of the Code, WBA policy, or the law, contact your manager or use one of the confidential reporting telephone lines/website addresses listed in Appendix A or email wbacompliance@wba.com.

37